# 24-2018-cv

## United States Court of Appeals

### *for the*

## Second Circuit

────────── ·•· ──────────

AMY MOORE, MIA LYTELL, NATASHA TAGAI, EMMA HOPPER,
BRITTANY HASSEN, BRITTANY REYES,

*Plaintiffs-Appellees,*

STEPHANIE CALDWELL,

*Plaintiff-Counter-Defendant-Third-Party-Defendant,*

– v. –

HOWARD RUBIN,

*Defendant-Counter-Claimant-Appellant,*

JENNIFER POWERS,

*Defendant-Third-Party-Plaintiff-Counter-Claimant,*

YIFAT SCHNUR, STEPHANIE SHON, BLUE ICARUS, LLC,
DOE COMPANY, JOHN DOE,

*Defendants.*

─────────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLEE MIA LYTELL

MATTHEW W. SCHMIDT
SCHMIDT LAW CORPORATION
*Attorneys for Plaintiff-Appellee
Mia Lytell*
116A Main Street
Tiburon, California 94920
(202) 746 9110

CP COUNSEL PRESS    (800) 4-APPEAL • (714331)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF THE CASE ............................................................... 1

QUESTIONS PRESENTED ................................................................. 6

STATEMENT OF FACTS ................................................................. 7

    A.    SPECIFIC ENCOUNTERS .......................................................... 7

        1.    BRITTANY HASSEN ....................................................... 8

        2.    NATASHA TAGAI ......................................................... 9

        3.    BRITTANY REYES ....................................................... 12

        4.    MIA LYTELL .............................................................. 13

    B.    THE "CONSENT AGREEMENTS" ............................................. 14

    C.    JURY INSTRUCTIONS ......................................................... 15

        1.    DISPUTES OVER INSTRUCTIONS ..................................... 15

        2.    INSTRUCTIONS THEMSELVES ......................................... 17

        3.    POST-VERDICT MOTIONS .............................................. 20

            a.    THE DISTRICT COURT'S ANALYSIS OF CONSENT ................................................................ 21

            b.    THE DISTRICT COURT'S ANALYSIS OF RUBIN'S STATE OF MIND ................................. 22

            c.    THE DISTRICT COURT'S ANALYSIS OF THE JURY CHARGE .................................... 24

            d.    THE DISTRICT COURT REJECTS RUBIN'S ARGUMENTS TO JUDGMENT AS A MATTER OF LAW OR ENTITLEMENT TO A NEW TRIAL ......................................................... 26

            e.    THE DISTRICT COURT CORRECTLY FINDS THAT PUNITIVE DAMAGES ARE AVAILABLE UNDER THE TVPA ............................. 27

ARGUMENT ....................................................................................28

I.    THE JURY INSTRUCTION ON *MENS REA* WAS
CORRECT AND, EVEN IF IT WAS INCORRECT, WAS
HARMLESS ERROR ........................................................28

    A.    THE DISTRICT COURT PROPERLY INSTRUCTED
THE JURY ON THE *MENS REA* REQUIREMENT
UNDER THE TVPA..................................................29

    B.    IF ANY ERROR DID EXIST IN THE
INSTRUCTIONS, AND IT DID NOT, SUCH ERROR
WAS HARMLESS AND NOT PREJUDICIAL ......................32

II.    RUBIN'S CONDUCT WAS SQUARELY COVERED BY
THE TVPA ......................................................................34

    A.    THE JURY HEARD EXTENSIVE EVIDENCE
SHOWING THAT, AT THE TIME OF
ENTICEMENT, RUBIN HAD THE NECESSARY
MENTAL STATE...................................................36

    B.    RUBIN'S STATE OF MIND WAS RELEVANT NOT
ONLY AT ENTICEMENT, BUT AT OTHER KEY
POINTS UNDER THE TVPA ....................................37

    C.    RUBIN"S MISPLACED POICY ARGUMENTS ARE
UNAVAILING .......................................................40

III.    THE JURY HAD MORE THAN SUFFICIENT EVIDENCE
TO REACH ITS VERDICT................................................42

    A.    LYTELL.............................................................44

    B.    TAGAI .............................................................45

    C.    HASSEN ...........................................................45

IV.    PUNITIVE DAMAGES ARE AVAILABLE UNDER THE
TVPA.............................................................................46

CONCLUSION ..................................................................................48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Adhikari v. Kellogg Brown & Root, Inc.*,
  845 F.3d 184 (5th Cir. 2017) ...............................................46

*Ardolf v. Weber*,
  332 F.R.D. 467 (S.D.N.Y. 2019) .........................................40

*Ditullio v. Boehm*,
  662 F.3d 1091 (9th Cir. 2011) ....................................... 46, 47

*Francisco v. Susano*,
  525 Fed. Appx. 828 (10th Cir. 2013)........................... 46, 47, 48

*Franklin v. Gwinnett Cnty. Pub. Schs.*,
  503 U.S. 60 (1992)........................................................ 46, 47

*Gelb v. Bd. Of Elections*,
  47 Fed. Appx. 10 (2d Cir. 2002).........................................38

*Gronowski v. Spencer*,
  424 F.3d 285 (2d Cir. 2005) ..............................................42

*Hygh v. Jacobs*,
  961 F.2d 359 (2d Cir. 1992) ..............................................28

*Johnson v. New York Hosp.*,
  96 F.3d 33 (2d Cir. 1996) .................................................38

*LeBlanc–Sternberg v. Fletcher*,
  67 F.3d 412 (2d Cir. 1995) .......................................... 42-43

*Lore v. City of Syracuse*,
  670 F.3d 127 (2d Cir. 2012) ..............................................28

*M.A. v. Wyndham Hotels & Resorts, Inc.*,
  425 F. Supp. 3d 959 (S.D. Ohio 2019) .................................42

*Manley v. AmBase Corp.*,
  337 F.3d 237 (2d Cir. 2003) ..............................................27

*Noble v. Weinstein*,
  335 F. Supp. 3d 504 (S.D.N.Y. 2018) ...................... 34, 36, 40

*Paguirigan v. Prompt Nursing Emp. Agency LLC*,
  No. 17-cv-1302, 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019)..........................46

*Renz v. Grey Advert.*,
  135 F.3d 217 (2d Cir. 1997) .................................................................28

*Snapp v. Unlimited Concepts, Inc.*,
  208 F.3d 928 (11th Cir. 2000) ..............................................................47

*United States v. Bazar*,
  747 Fed. Appx. 454 (9th Cir. 2018).......................................................40

*United States v. Brutus*,
  505 F.3d 80 (2d Cir. 2007) ...................................................................28

*United States v. Chang Ru Meng Backman*,
  817 F.3d 662 (9th Cir. 2016) ................................................................34

*United States v. Cote*,
  544 F.3d 88 (2d Cir. 2008) ...................................................................43

*United States v. Josephberg*,
  562 F.3d 478 (2d Cir. 2009) .................................................................43

*United States v. Mulder*,
  273 F.3d 91 (2d Cir. 2001) ...................................................................35

*United States v. Munoz*,
  Fed. Appx. 547 (2d Cir. 2019)...............................................................28

*United States v. Todd*,
  627 F.3d 329 (9th Cir. 2010) ................................................................36

*United States v. Tropiano*,
  418 F.2d 1069 (2d Cir. 1969) ...............................................................43

*Warfaa v. Ali*,
  1 F.4th 289 (4th Cir. 2021) ...................................................................46

**Statutes & Other Authorities:**

18 U.S.C. § 1591 ........................................................................... 1, 41

18 U.S.C. § 1591(a) ................................................................ 34, 35, 40

Fed. R. Civ. P. 50(b) .................................................................. 21, 26

Fed. R. Civ. P. 51 ...........................................................................38

iv

Fed. R. Civ. P. 59 ................................................................ 21, 26

Fed. R. Civ. P. 59(a) ................................................................ 27

Fed. R. Civ. P. 61 ................................................................ 28

Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22 .................... 41

William Wilberforce Trafficking Victims Reauthorization Act of 2008,
    Pub. L. No. 110-457 ........................................................ 41

American Heritage Dictionary (5th edition 2022) ................................. 39

## STATEMENT OF THE CASE

The District Court correctly accepted the jury's findings, following a seven-day trial, that Defendant-Appellant Howard Rubin ("Rubin") had violated the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1591, *et seq.*, in his actions against Plaintiff-Appellee Mia Lytell ("Lytell"), as well as Plaintiff-Appellees Natasha Tagai ("Tagai"), Brittany Hassen ("Hassen"), Brittany Reyes ("Reyes"). Amy Moore ("Moore"), and Emma Hopper ("Hopper").

The crux of the testimony that the jury heard, and accepted, was that Rubin had lured each of the six Plaintiff-Appellees to an apartment in New York to beat and rape them. Rubin's actions were his own, and both part of a pattern and involved extensive planning, such that Rubin knew—or at a minimum recklessly disregarded—his own state of mind, that he would later ignore each of the Plaintiff-Appellees' when they repeatedly asked him to stop having sex with them.

While Rubin frames his arguments as primarily questions of law challenging aspects of the TVPA, they are—as the District Court correctly found in its detailed and well-reasoned Order Denying Rubin's Motion for Judgment as a Matter of Law or, Alternatively, for a New Trial (the "Post-Trial Order," Dkt. No. 425 (SA-105-123))—overwhelmingly questions of fact that were presented to the jury and solidly decided in Plaintiff-Appellees favor. Rubin and his attorneys had ample opportunity to present their facts and interpretation of those facts to the jury, and the jury rejected

them. And the District Court, after viewing days of emotional testimony, repeatedly affirmed in the Post-Trial Order that it found the jury's rejection of Rubin's version of events entirely reasonable.

To the extent that Rubin insists that his behavior is not "typical" sex trafficking, and should not be covered by the TVPA, he is also wrong. As the District Court recognized, Rubin's behavior was, "in many respects," the "archetypical TVPA case," and "fully in line" with Congress's intent when it enacted the TVPA and its civil remedy. (SA-123.) Rubin's focus on the fact that the encounters began as consensual is especially irrelevant: Few sex trafficking situations actually begin with the defendant grabbing random strangers off the street and stuffing them into a nondescript van. They instead, almost always, begin as consensual in order to lure the victim into a situation where it is more difficult for them to resist once force, fraud, or coercion is used.

So too here. As the jury heard, Rubin lured each Plaintiff-Appellee by a promise of consensual commercial sex. They were repeatedly reassured, including by comparisons to the popular *50 Shades of Grey* movie series, that Rubin would stop any sex act if they became uncomfortable. Then, once they were physically restrained and unable to escape, Rubin proceeded to violently rape them, often causing serious physical damage.

Rubin's primary defenses to all this—that consent existed because he warned

2

his victims generally of "BDSM sex"; that many of them returned in hopes it would not happen again; and that they sometimes expressed positive statements in text message in order to get payments they were promised—are all questions of fact concerning the parties' state of mind that were before the jury. The jury's task was to determine what had happened years prior in a private room between Rubin and each of the Plaintiff-Appellees—events which Rubin often failed to remember and which each of the Plaintiff-Appellees recounted in detail. Rubin fully presented his version of facts to the jury, which soundly rejected it.

Rubin's new argument on appeal, that the District Court was somehow biased against him because it did not agree with the "rough sex" that he was engaged in, has no basis whatsoever. Nothing in the legal determinations here turn on whether Rubin engaged in BDSM, rough sex, or any particular practice: Rubin would have faced the same TVPA liability had he exceeded consent, even without any physical violence. But the jury did hear extensive testimony on the nature of the physical harm he inflicted on the Plaintiffs-Appellees, both for purposes of damages and because Rubin himself had argued that they had eagerly consented to his activities. There is no serious argument that, if Rubin wanted to engage in what he claimed was consensual sex where the other party was tied up, often gag, and beaten by him, he was responsible for ensuring that they understood and consented to what he did. This was, again, a question for the jury, and they made clear that they did not agree with

3

Rubin's version of events. And Rubin has not even pointed to any allegedly biased comments that the District Court made to the jury in this matter at all. To the contrary, the District Court even gave the jury an instruction that BDSM was not, by itself, a violation of a TVPA. And despite the District Court's musings in opinions of whether it was legally possible to consent to the level of violence in play, the jury was in fact specifically instructed that the TVPA was not violated if a woman consented to the BDSM acts.

For these, and more reasons discussed below, each of Rubin's specific arguments fail:

*First*, the jury reasonably found that the TVPA's *mens rea* requirement was satisfied because the jury was both correctly instructed and heard extensive testimony allowing it to find that Rubin had acted knowing, or at least recklessly disregarding, that each of the Plaintiff-Appellees would be forced into commercial sex acts. As the District Court recognized when it rejected this argument in the Post-Trial Order, the jury was repeatedly instructed on burden of proof and the requirements as to Rubin's state of mind.

Not only was there ample evidence that each of the Plaintiff-Appellees communicated their consent, but there is no requirement that a TVPA plaintiff affirmatively communicate their consent in a specific form. Regardless of specific words, if a perpetrator knows or reasonably should know that the person they are

4

having sex acts with does not consent—due to factors that would alert a reasonable person, such as a victim crying or screaming—then they are liable. This is, again, a highly fact-specific inquiry, especially in what Rubin claims is the BDSM context, which the jury and the District Court were best placed to analyze.

*Second*, Plaintiff-Appellees presented ample evidence allowing the jury to find that Rubin had the requisite state of mind not only when consent was exceeded, but at all relevant times, and the jury was correctly instructed on this point. Not only does the TVPA have numerous verbs at which the trafficker's state of mind is checked—including "harboring," "obtaining," or "patronizing," which would apply at the specific time that consent was withdrawn—but the jury could also have reasonably, and in fact easily, found that Rubin was at least reckless in his state of mind at the time that the victims traveled to New York. As the District Court emphatically stated in its Post-Trial Order, the jury "[c]ertainly" could "find that reasonably all of these plaintiffs told him to stop," and if Rubin "didn't know that he was bringing women in to inflict upon them a level of force beyond their consent," Rubin was "kidding himself" (i.e., acting recklessly). (SA-111.)

Third, there was ample evidence to support the jury's verdict on the TVPA as to each of the Plaintiff-Appellants—and particularly as to Lytell, Tagai, Hassen, and Reyes. When Rubin raised this argument below, the District Court correctly characterized it as "perfunctory," because there is no reasonable argument that the

jury heard detailed testimony on this point.

Fourth, as the District Court correctly recognized, each of the three Courts of Appeal that have considered the question have found that the TVPA authorizes punitive damages.

The jury and District Court reached the correct conclusion below. And nothing that Rubin raises now is grounds to overturn the jury's well-reasoned verdict or the District Court's well-considered rulings.

## QUESTIONS PRESENTED

1. Did the District Court correctly instruct the jury that Rubin was liable if he knew, or recklessly disregarded, that each Plaintiff-Appellee had withdrawn her consent—and if not, was such error harmless?

2. Did the jury hear sufficient evidence to find that Rubin had the required state of mind under the TVPA at all relevant times, and at a minimum when he harbored, obtained, or patronized each Plaintiff-Appellee?

3. Did the jury hear sufficient evidence to find that Mia Lytell had established all elements of their claims under the TVPA, while exercising the jury's sound discretion as to the weight and credibility of evidence?

4. Did the District Court correctly follow every Court of Appeals to consider the issue in finding that the TVPA authorizes punitive damages?

**STATEMENT OF FACTS**

Over seven days of testimony in March and April 2022—following over four years of litigation—the jury heard extensive evidence from Rubin, his co-defendant Jennifer Powers, and the six Plaintiffs-Appellants. The case was, as the District Court had recognized in its summary judgment Order more than two years prior, a "credibility dispute" where "Plaintiffs claim Rubin coerced them into having commercial sex whereas Rubin claims Plaintiffs consented to the entirely of their encounters together." (Dkt. No. 290 at 5; *see* Dkt. No. 415 at 6.)

The six Plaintiffs-Appellants presented extensive evidence of their encounters with Rubin. This included testimony that Rubin had, all without consent, penetrated Plaintiffs including with foreign objects; used electric shocking devices; tied them up; restrained them with tape; punched them (in one instance for forty minutes); whipped them; kicked them; among other acts. As all parties knew that consent was a crucial question of the case, consent was a central question and addressed extensively in the testimony.

A. SPECIFIC ENCOUNTERS

Rubin met Lytell, Hassen, Reyes, and Tagai for a total of nine times in which Rubin exceeded their consent.[1]

---

[1] The encounters of Moore and Hopper are addressed in separate briefing by their counsel.

7

1. BRITTANY HASSEN

Hassen had her first encounter with Rubin in 2011. (*See* A-552.) In text messages before their meeting, Rubin wrote to Hassen, "I can guarantee . . . you will always -- you will feel safe." (A-552.) However, at their encounter, Rubin restrained Hassen with "masking tape," used to tie her "hands behind [her] back," without asking Hassen for permission and to which Hassen testified she did not consent. (A-555.) Rubin proceeded to "put tape over [Hassen's] mouth," rendering her unable to speak. (A-557.) Hassen testified that Rubin had not asked for permission to tape her mouth, and she did not consent. (A-557-58.) Rubin then proceeded to penetrate Hassen, again not asking permission and to which Hassen did not consent. (A-561.)

At this point in the encounter, Hassen testified that she was "crying hysterical" and "wanted everything to stop." (A-561.) Rubin continued the penetration for what Hassen estimated to be "[p]robably fifteen minutes," after which he untied her without saying anything. (A-561.)

Hassen met with Rubin several more times, including one time where he "whipp[ed]" Hassen "all over [her] body," without her permission or consent, while calling her "fat" and "a stupid girl" "over and over," for what "felt like an hour." (A-572.) Rubin also used a "machine that was handheld with [] like a shot-glass size cup" that had a "suction" effect, as well as an "electric" device" that "zap[ped] her, and which Hassen also did not consent to. (A-577-78.) Hassen also lost the ability

8

to "taste" due to Rubin's use of a ball gag that had been "cleaned with pool cleaner" and created a "burning sensation." (A-579.)

### 2. NATASHA TAGAI

Tagai met Rubin through a recruiter named Tracy on the modeling platform Model Mayhem. (A-334.) Tracy told Tagai that, since Tagai had previously modeled for Playboy, Tracy she had a "client" who "met up with models" and "who liked to take Playboy girls out for dinners and compensate them for their time. (A-334.) While Tagai had never done such a thing before, she felt "comfortable" because she was contacted by a woman, in addition to the harmless nature of the request. (*See* A-334-35.) Several days later, Tracy introduced Tagai to Rubin via email. (A-335.) Tagai then traveled to New York to meet Rubin in 2009 or 2010, whom at the initial meeting she found to be a "very nice, wonderful man," with whom she "had a lot of conversation." (A-335-36.) Over the next several years, Tagai met Rubin "six to eight" times in New York, at locations including a hotel, his apartment, and restaurants. (A-336.)

In his apartment, Rubin showed Tagai what he called the "red room," related to what Tagai described as Rubin's "fixation" with the movie "*50 Shades of Grey*." (A-337.) Even at the time of her trial testimony in 2022, while Tagai had heard the term BDSM, she did not know its exact meaning and understood it to mean "being tied up" and "you are whipped and stuff; but to an extent when you say stop, it stops."

(A-338.)

Tagai began having consensual BDSM with Rubin up until 2015, during which time Rubin never provided her with a safe word. (A-338-39.) Then, in October 2015, Rubin asked Tagai to sign what he calls here the "consent agreement" for what Rubin claimed was a photo shoot. (A-339.) Tagai and Rubin then went back to Rubin's apartment and, after playing some pool, Rubin "shoved a pool cue into [Tagai's] vagina." (A-341) Tagai immediately told Rubin to stop—Rubin did not immediately stop, but did so after "maybe like 10 seconds." (A-341-42.) After he stopped, Rubin "seemed like he was upset" and left Tagai to go into the red room to get "some rope." (A-341.) When Rubin returned with the rope, Tagai was "sitting on the floor" in "shock." (A-343.) Rubin then took of Tagai's clothes, tied Tagai's ankles and wrists together and "dragged [her] into the red room" by her feet. (A-344, A-350.) Tagai did not ask Rubin to stop during the dragging because she "was scared," but testified that she did not consent to being tied up or dragged. (A-345.) Once in the red room, Rubin placed a ball gag in Tagai's mouth, making her unable to speak. (A-345.)

Once Tagai was tied up, gagged, and unable to speak in the red room—and having not spoken since she told Rubin to stop inserting a pole cue into her vagina—Rubin "grabbed" a device that "look[ed] like a little knife," a "pizza-cutter looking thing." (A-347.) Rubin proceeded to put the devices on her breasts. (A-347.) The

devices "hurt," and Tagai never gave permission or consented to them, but could not speak as she was gagged; she also was unable to leave as she was tied up. (A-347.) Rubin did not ask her permission, but "repeatedly" told Tagai that she was "a stupid girl." (A-347.)

Rubin then pulled out a "glass-looking dildo device" and penetrated Tagai with it, before untying Tagai, leading her across the room, and moving her to an "X" cross-like device and tying her to that with leather cuffs, strapped tight enough that Tagai could not escape. (A-347.) Tagai testified that at this would, she was "scared" that she if cried it would "upset" Rubin. (A-347.)

Rubin then, again without asking permission, proceeded to take out a whip, with which he "repeatedly hit [Tagai] in her vagina over and over." (A-351.) Tagai testified that she did not consent to this. (A-351.) He then penetrated Tagai again, and "punched [her] in the stomach" and "hit her in the face," while "laughing in [Tagai's] face" and calling her a "stupid girl" repeatedly. (A-351-52.) Tagai estimated that this beating went on for *45 minutes*. (A-352.) Eventually, after a hit to the face, Tagai "got very just squirmy," which caused Rubin to become "upset"— he began "yelling" and told Tagai that she was "wast[ing] his time, before untying her and leaving. (A-352.) Tagai stayed alone in the room for at least 30 minutes after Rubin left, then texted Rubin's recruiter Jennifer Powers to describe what happened; Powers then apparently passed on the message to Rubin, who texted Tagi and called

her a "cunt" and that she had "wasted his time." (A-354.) Tagai suffered bleeding from the pole cue, and bruises from whipping on her breasts. (A-357.) She also testified that based on that encountered, she had "anxiety all the time," and had been "diagnosed" with "PTSD," for which she attends "therapy once a week." (A-357.)

Tagai had five more encounters with Rubin. (A-357-58.) While she acknowledged in trial testimony where it seemed "crazy, absolutely" in retrospect that she came back, at the time she had "just thought that [Rubin] would . . . go back to how he acted prior." (A-358.)

### 3. BRITTANY REYES

Brittany Reyes was introduced to Rubin through a "trusted friend" and met in March 2016. (A-386.) Reyes "was led to believe" that Rubin was interested in "light spanking" and "fantasy, role-playing kind of thing." (A-389.) Reyes was "tied facedown" with her "wrists and ankles" restrained, a "ball gag" placed in her mouth, and a "blindfold" placed over her "eyes." (A-391-92.) She was "then sexually assaulted with a dildo, hit and kicked" and "punched." (A-392.) Reyes testified that she "[d]efinitely" did not consent to being hit. (A-393.) She "tr[ied]" to "say the safe word," but could not because of the "ball gag" in her mouth. (A-393-94.) Reyes estimates that she was sexually assaulted in this manner "[s]omewhere between 10, 20, 30 minutes." (A-394.)

Eventually, Rubin removed the ball gag, and Reyes then said her safe word.

(A-394.) However, Rubin did not "stop sexually assaulted" her until she said the safe word "a couple times," a time period Reyes estimates as "5 or 10 minutes." (A-395-96.) Reyes testified that Rubin had appeared to hear the safe word the first time that she used it, as he had a "reaction"—he became "angry and violent" and "assaulted [her] harder." (A-396.)

### 4. MIA LYTELL

Lytell had her first encounter with Ribin at the same time as Plaintiff-Appellant Amy Moore, in August 2016. (*See* A-458.) They both returned to Rubin's apartment and Rubin then suddenly "smacked [Moore] across the face . . . out of nowhere." (A-458.) Lytell testified that Moore appeared "shocked" at the slap, "grabbed her cheek" and "told [Rubin] not to hit her. (A-468.) Rubin ignored this request and "hit her again." (A-458.)

Sometime later, Rubin took Lytell to the "red room," where Rubin placed her "face down on the ground" with Rubin "pushing [her] down and trying [her] up," with her "wrists tied behind [her] back" and her "ankles tied." (A-460-61.) Rubin then taped Lytell's mouth, so that she could not speak. (A-461.) Rubin did not ask permission for these actions, and Lytell testified that she did not consent to them. (A-462.) Rubin then called Lytell "the baby" and stated that he was "the daddy" and said that "the daddy had to beat his baby." (A-463.) Rubin then punched Lytell in the "back of the head," in the "side of [her] ribs," and "on [her] breasts." (A-464.)

13

Lytell testified that this beating lasted "[a] long time" and estimated it to have lasted "40 minutes." (A-464.)

While these beatings took place, Lytell was "crying" and "saying stop"—while she had tape over her mouth, she believed Rubin could "hear [her] very well." (A-464.) Rubin then ordered Moore to hit Lytell (and hit Moore herself "in the her face" when she refused to comply), and then "push[ed]" Lytell "down" and began "penetrating" her—Lytell testified that Rubin did not ask for permission for this and she did not consent." (A-465.) Lytell was able to say "no" through the tape, but Rubin did not stop—Lytell testified that Rubin continued for what "seemed like forever." (A-466.) When Rubin finally stopped, he told Lytell that he "would rape [her] like he rapes his daughter," called Lytell and Moore "cunts," then without further elaboration untied Lytell and left the apartment. (A-466.)

B. THE "CONSENT AGREEMENTS"

Rubin required each Plaintiff-Appellee to sign a "Confidentiality Agreement and Release," which set forth in part:

> In return for the payment of an agreed upon fee, I have voluntarily agreed to engage in sexual activity with (Rubin) [sic] including Sadomasochistic (SM) activity that can be hazardous and on occasion cause injury to my person. The activity in question may be undertaken on this date, dates prior to this date, and dates in the future. The Agreement is intended to cover each of the dates in question and a new agreement is not required for each subsequent date.
>
> **Mutual Release**. I understand that participation in the Activities described above is potentially hazardous. My participation in the

14

> Activities is done knowingly. I freely assume all associated risks. I acknowledge and agree that participation in these Activities carries with it certain inherent risks that cannot be eliminated completely.

(A-846-47.) Rubin has not taken the position that these are legally binding releases—rather, he calls them "consent agreements" and argues that they show both that Plaintiffs-Appellees each consented to the acts performed, and that Rubin reasonably believed that they consented. (Brief for Defendant-Counter-Claimant-Appellant ("Br.") at 23.) The agreements did not include any further or specific descriptions of acts which Rubin expected to perform. (A-846-47.)  To the extent that it gave any specific indication of the level of BDSM activity intended, it said only that it "*can be* hazardous," "*on occasion* cause injury," and was "*potentially* hazardous"—suggesting that any physical harm would likely be incidental. (*Id.* (emphasis added).) Rubin also testified that he was well aware of the *50 Shades of Grey* films—popular films that portrayed relatively mild BDSM—and in fact had begun using those agreements knowing that what people knew of BDSM at that time was often based on that film. (A-637.)

### C. JURY INSTRUCTIONS

#### 1. DISPUTES OVER INSTRUCTIONS

Rubin, along with his co-defendant Jennifer Powers, with him he joined, raised objections to several aspects of the District Court's proposed jury instructions, as well to the amended proposed jury instructions. (SA-10-104.)

15

Rubin's co-defendant Powers submitted a letter on March 31, 2022, in which Rubin joined. (SA-10, SA-28.) Much of Powers's argument, which Rubin has not raised on appeal, was that the TVPA does not in fact allow a state of mind to be shown by evidence of modus operandi or even a pre-formed scheme, and that "[a]s drafted, the statute requires proof that may well be impossible ever to prove." (SA-10-12.) Given the volume of Powers's changes, instead of a redline, she requested deletion of seven pages of the proposed charge and provided a replacement eight pages. (SA-15.)

As part of these replacement pages, Powers included definition of the six operative verbs at which a defendants' state of mind is tested under the TVA: "recruit," "entice," "harbor," "transport," "obtain," and "maintain." (SA-17.) These definitions proposed by Powers, and joined by Rubin, were identical to those initially proposed by the District Court and (except for the lack of commas in the version in the official transcript) identical to the one charged to the jury. (SA-17, SA-38, A-701.)

In addition to joining in on Powers's proposed changed, Rubin submitted his own letter proposing additional changes. (SA-28.) One of these was a revision to the definition of "knowledge," which the District Court accepted, and which specifically recognized that knowledge may be inferred from a person's actions:

> Whether a defendant acted knowingly may be proved by his conduct and by all of the facts and circumstances surrounding the case. In your

16

> everyday affairs, you are frequently called upon to determine a person's
> state of mind from his words and actions in given circumstances. You
> are asked to do the same here.

(SA-39.) In a related change, Rubin recognized that jury charges are taken as a whole, and struck another definition of "knowledge," on the next page, replacing it with the text, "I have already defined what it means for a person to act 'knowingly.'" (SA-40.) Rubin did not request any change to the definitions of the verbs "recruit," "entice," "harbor," "transport," "obtain," or "maintain," specifically leaving them unmarked in his redline. (SA-38.)

Rubin objected entirely to any inclusion of a withdraw-of-consent instruction as to the TVPA claim, under an earlier version of his theory that "if it is shown that any plaintiff agreed to engage in commercial sex, then there was no violation of section 1591, even if she withdrew her consent during the encounter." (SA-44.) Rubin reiterated this objection in a subsequent letter on April 2, 2022. (SA-67.)

## 2. INSTRUCTIONS THEMSELVES

The District Court's final jury charge included extensive instructions on the *mens rea* requirement under the TVPA, including related issues of consent:

> Now, the third element that the *plaintiffs have to prove*, and by a
> preponderance, to support their claim for sex trafficking is that the
> defendant engages in any of the acts that I mentioned to you, that long
> list of words before, and *that **the defendant knows or recklessly
> disregards** the fact that force, the threat of force, fraud or coercion, will
> cause the plaintiff to engage in a commercial sex act in which the
> plaintiff would not otherwise have willingly engaged*. In other words,
> *the **defendant's actions must show that the defendant knows or***

17

> *recklessly disregards* the fact that the conduct in which the defendant
> engages will, through force, threat of force, fraud or coercion, cause a
> person to engage in a commercial sex act against their will.

(A-702, SA-100 (emphasis added.))

> *If a person proves by a preponderance of the evidence that a plaintiff*
> *consented to engage in a commercial sex act, then the defendants are*
> *not liable under this statute.* . . . The defendant's burden on the issue of
> consent is different from *the plaintiff's requirement to prove that the*
> *defendant engaged in conduct that the defendant knows, or recklessly*
> *disregards, through force, threat of force, fraud or coercion, would*
> *cause a person to engage in a commercial sex act against their will.*
>
> . . . .
>
> *If you find that a plaintiff consented to a commercial sex act, then the*
> *defendant doesn't have the requisite knowledge for liability* under this
> sex trafficking law. In other words, if the plaintiff you're considering
> consented to engage in a commercial sex act about which you've heard
> evidence, then her claim under this cause of action far is. That is,
> *consent is a complete defense to this cause of action*.

(A-703-04) (emphasis added).)

The District Court also instructed the jury on the ability to withdraw consent:

> Consent isn't permanent, *if a person willingly agrees to engage in a*
> *commercial sex act, but later changes her mind, and then is forced to*
> *continue to engage in a commercial sex act against her will by force,*
> *threat of force, fraud or coercion, then a commercial act becomes*
> *involuntary*, not with consent.

(A-705) (emphasis added).)

The District Court also instructed the jury on how consent is communicated:

> Now, you all have a basic understanding of what consent is. It is simply
> the willingness for conduct to occur. *It may be manifested by words and*
> *as so by action, or by in action. In determining whether a plaintiff's*

18

> *words, silence, or conduct manifests consent, you have to consider the surrounding facts and circumstances, including subsequent conduct and statements.*
>
> Consent, whether expressly given or implied in fact, is not a defense if such consent is obtained by fraud or duress. Additionally, consent can be deemed invalid for numerous reasons, including the lack of capacity to consent or coercion or mistake. Consent has boundaries. *A person can give consent as to certain type of activities or touching and not as to others that might occur during the same encounter.*

(A-705) (emphasis added).)

The District Court further instructed the jury on specific consent issues regarding

BDSM, and in fact specifically instructed the jury that BDSM activity was

permissible under the TVPA:

> Now, throughout the trial you heard evidence about practices called bondage, discipline, domination, submission, sadism, masochism or BDSM, that may involve the use of force or actual physical restraint, as well as the infliction of physical pain. *The fact that force or physical restraint was used during the course of a BDSM act does not, by itself, mean that the statute was violated.* Moreover, *if you find that the plaintiff you are considering consented to the BDSM act, then by definition, neither force nor coercion were used.*

(A-705-06) (emphasis added).)

Later in the instructions, when discussing common law torts, the District

Court provided further examples of withdraw of consent—these did not conflict with

the earlier

> Consent has boundaries and it's not a permanent state of mind. A person can give consent as to certain types of activities or touching and not as to others that might occur during the same encounter. For example, if you consent to engage in a boxing match with a sparring partner, you

19

can agree to the rules and agree to the point at which the boxing match has to stop. To continue the example, if your sparring partner doesn't follow those rules or stop as agreed, that person has exceeded your consent. *Moreover, even if you agreed to three rounds with your sparring partner, if you let that person know after the second round that you don't want to go for a third, you've revoked your consent for the boxing match.*

. . .

Returning to the boxing example that I mentioned earlier, let's say two people agree to a three-round boxing match. After two rounds, both people have cuts and bruises. But neither is liable to the other because both agreed to engage in that type of activity. In the third round, one of the participants breaks the rules and injures the other, they think it's like a mixed-martial arts match instead of a boxing match, so they kick somebody. The participant that broke the rules is only on the hook for the damages caused by the activity that broke the rules, not all the agreed upon boxing injuries from the first two rounds. Similarly*, if two people agree to box for three rounds and at the end of the second round one wants to stop but the other won't listen, well, then the participant that didn't listen is only on the hook for the damage caused after that person said stop.*

(A-709, SA-104.)

### 3. POST-VERDICT MOTIONS

The jury returned a verdict in favor of all six Plaintiffs-Appellees on the TVPA claims again Rubin, awarding $500,000 in compensatory damages and $120,000 in punitive damages.[2] (SA-106.) Rubin subsequently moved for judgment

---

[2] The jury additionally found in favor of Plaintiff-Appellee Amy Moore on a battery claim, and awarding her $250,000 in punitive damages rather than $120,000. (SA-106.) The jury found in favor of Rubin's co-defendant and "procurer," Jennifer Powers. (*Id.*)

as a matter of law or a new trial under Federal Rules of Civil Procedure ("Rule") 50(b) and 59, which the District Court denied on March 20, 2024. (SA-105.)

Rubin's post-verdict arguments were largely the same as the ones he raises here, and the District Court denied them in large part based on its observation of the days of often-emotion in-person testimony that had been presented to the jury.

### a. THE DISTRICT COURT'S ANALYSIS OF CONSENT

The District Court began its factual analysis by recognizing that the "central issue" in the case—which the District Court criticized Rubin for "only acknowledg[ing] in passing"—was: "did plaintiffs 'consent' to extreme acts of violence as part of their contracts for sexual services?" (SA-109.) While before the District Court, as here, Rubin relied heavily on his "consent agreements," the District Court noted that, given its vague language, a main question was whether there was a "meeting of the minds on the notion of what constitutes 'BDSM.'" (*Id.*) Referencing its earlier summary judgment ruling, the District Court recognized that an agreement for "BDSM" would certainly not be understood to extend to permanent disfigurement, dismemberment, or death, and no person in Rubin's position could possibly understand that Plaintiff-Appellees were agreement to that level of harm, especially for payments that typically amounted to $5,000 per encounter. (*Id.*) Where exactly that line was, and whether that consent extended to "penetration with an electric prod and a pole cue," was "a fact issue." (SA-109-10.)

This uncontroversial analysis of the limits binding consent to sexual acts is what Rubin attempts to frame as some sort of anti-BDSM bias on the part of the District Court—that "it simply would not allow the possibility that people could consent to rough sex of the sort described by Rubin and the plaintiffs." (Br. at 26.) But the District Court's analysis was not critical of consent to rough sex, but rather effectively irrevocable prior consent without full disclosure. (*See* SA-109-10.) If Rubin had carefully sat down with each woman before a session, talked through specific acts he wished to perform, confirmed that they consented to each act, and presented regular opportunities during the sessions themselves for the women to stop, then the situation would have been entirely different. But Rubin categorically rejected this approach, and instead relied on vague advance statements that, as the District Court recognized, could easily be understood differently by the average reasonable person. As the District Court further recognized, this "was an issue for the jury to decide, and they did." (SA-110.)

b. THE DISTRICT COURT'S ANALYSIS OF RUBIN'S STATE OF MIND

The District Court went on to reject Rubin's argument as to his state of mind, again on the grounds that Rubin was seeking to relitigate what was "a factual issue for the jury." (SA-110-11.) As the District Court recognized, the jury heard extensive evidence of Rubin engaging in highly similar conduct with a number of women— who, accordingly to their their testimony, had clearly communicated that they did

not consent to the encounters—and engaged in acts that clearly required some degree of planning, at the very least to acquire the various items he would use.[3] The District Court also recounted some of the physical harm that Rubin caused to the women, including "vaginal tearing, heavy and permanent bruising," damaged to a breast implant, and a "bruised or broken rib," at least some of which Rubin would have been aware of in his encounters. (SA-111.) Based on all that evidence, the District Court found that the jury could have easily found that Rubin acted at least recklessly at the time of recruitment or transport, summarizing the situation with a rhetorical question:

> *How many women have to tell Rubin to stop before he gets the message that when he's bringing them to New York to do the things he's doing, they felt forced into doing those things?* Certainly the jury could find that reasonably that all of these plaintiffs told him to stop. If Rubin didn't know that he was bringing women in to inflict upon them a level of force beyond their consent, the jury could reasonably find that he was kidding himself, *i.e.*, that he was certainly reckless in disregarding that likelihood.

(SA-110-11.)

While unnecessary given this finding, the District Court went on to reject Rubin's argument that his state of mind was tested only at the time of recruitment or

---

[3] The District Court summarized the acts that Rubin engaged in to include "vaginal penetration with a pool cue; clamping clothes pins to breasts; insertion of electric artificial phalli; penetration while gagged; intercourse while tied up; penetration with a "cattle prod"; and repeated punching, slapping, whipping, and dragging while bound." (SA-111.)

transport, as he could have been liable based on this time at the time of "harboring," "obtaining" or "patronizing" each of the Plaintiff-Appellees—for which "[t]he evidence was more than sufficient for the jury to find." (SA-112.)

### c. THE DISTRICT COURT'S ANALYSIS OF THE JURY CHARGE

After then rejecting arguments that Rubin did not make on appeal—that there was no "commercial sex" and, as to Plaintiff-Appellee Reyes, no effect on interstate commerce—the District Court moved on to Rubin's jury charge argument, that it "did not advise the jury that to be liable, Rubin had to know, or recklessly disregard the fact, that a plaintiff had withdrawn her consent." (SA-114.) The District Court rejected this argument for several reasons, including that such a focus on a specific portion of the instructions ignored "the standard instruction given to all juries, including this one, that they should not isolate on any one jury instruction but must view the charge as a whole," as well as ignoring a further instruction given to the jury in response to a note:

> Where consent has been given and then a person is not present when the consent is withdrawn, the person who is not present must know, or recklessly disregard, the withdrawal of the consent during the commercial sex act to be liable for that act of sex trafficking.

(SA-115.) As Rubin noted, the note was concerning Rubin's co-defendant who was not present during the sex acts, and thus specifically concerned "a person who is not present when the consent is withdrawn." (Br. at 32.) But as the District Court went on to explain, these instructions "dovetailed with the instruction that plaintiffs had

the burden of proving that Rubin knew or recklessly disregarded that prohibited conduct would be used to obtain sex," and "[b]ecause the jury had already been told that was an element of plaintiff's case, it did not have to be repeated multiple times." (SA-115.) And while not explicitly stated, by reference to the instruction of considering the charges as a whole, the District Court suggested that the jury would understand that the knowledge requirement was the same as to persons present and not present: not that *only* persons who were present risks liability where a plaintiff secretly withdrew consent without any way for the defendant to know. (*Id.*)

After this analysis, the District Court further found that Rubin's argument was "largely immaterial"—and thus any error was harmless—given the testimony that the jury had heard. (SA-115.) Specifically, no Plaintiff-Appellee testified that they had withdrew but not communicated consent; on the contrary, each testified that they had asked Rubin to stop. (*Id.*) As the District Court recognized, Rubin even conceded that "the fair inference from the jury's verdict is that it found that each Plaintiff withdrew her consent at some point during her encounter with Rubin." (*Id.*) Even if the jury had somehow misunderstood the jury instructions exactly as Rubin posits (and thus understood that Rubin was liable if a plaintiff secretly withdrew consent without telling him) this would only have made a difference if they disbelieved *each* of the six Plaintiff-Appellees on the most important part of their testimony but believed the rest.

d. THE DISTRICT COURT REJECTS RUBIN'S ARGUMENTS TO
JUDGMENT AS A MATTER OF LAW OR ENTITLEMENT TO
A NEW TRIAL

The District Court then analyzed Rubin's challenge to the sufficiency of
evidence, which the District Court categorized as "perfunctory." It found that the
record did "not come close" to meeting the Rule 50(b) standard—and the only
disputes were to "pure issues of fact that turned on the jury's evaluation of the
witness' credibility." (SA-116.)

The District Court then went on, as Rubin had himself requested when he
made a Rule 59 motion, to offer its own candid view of the overly fairness of the
result, based in large part of the manner of testimony which was not fully reflected
in the transcript:

> The jury likely saw plaintiffs the same way I did – and probably the
> same way Rubin did – as vulnerable and desperate people with limited
> ability to see much beyond the moment. They were ripe for the taking,
> which was why Rubin was able to exploit them the way he did.
>
> On the other hand, Rubin also likely struck the jury the same way he
> struck me – someone so wrapped up in his own wealth, power, and base
> desires that he had little regard for the consequences of his actions or
> his victims' reactions to them. When he testified – virtually boasted –
> that 'I personally derive sexual pleasure from inflicting – you know,
> getting off, but inflicting physical pain and verbal abuse' on women,
> without apology or explanation, it was not egregious, a miscarriage of
> justice, or a seriously erroneous result for the jury to conclude that
> Rubin wasn't the kind of person who would have much regard for his
> victims' wellbeing, even if his testimony was more erudite than theirs.
> The jury could reasonably believe that, at least when it came to
> encounters with his procured women, he was more divorced from
> reality and societal norms than plaintiffs were, such that the jury did not

26

want to credit his perspective over theirs.

I am not offended by the balance the jury struck and thus see no basis for a new trial.

(SA-117.) While Rubin characterizes this as "gratuitous expressions of contempt," in context this was the District Court properly ruling on Rubin's Rule 59(a) motion, which asked the District Court to apply its own discretion to trial testimony.[4]

### e. THE DISTRICT COURT CORRECTLY FINDS THAT PUNITIVE DAMAGES ARE AVAILABLE UNDER THE TVPA

Lastly, after rejecting a challenge to the jury's award of compensatory damages, which Rubin does not raise on appeal, the District Court rejected Rubin's argument that the TVPA did not allow punitive damages. (SA-121.) The District Court found persuasive the conclusion of the four Courts of Appeals to have addressed the issue—the Courts of Appeals for the Fourth, Fifth, and Tenth Circuits—that the TVPA does allow punitive damages. (SA-121-22.)

---

[4] A Rule 59(a) motion "may be granted even if there is substantial evidence supporting the jury's verdict" and the trial judge "is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner," but may only order a new trial if it concludes that 'the jury has reached a seriously erroneous result" or "the verdict is a miscarriage of justice." *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003) (citing various cases). Such a ruling on appeal is reviewed for "abuse of discretion." *Id.*

## ARGUMENT

## I. THE JURY INSTRUCTION ON *MENS REA* WAS CORRECT AND, EVEN IF IT WAS INCORRECT, WAS HARMLESS ERROR

The District Court correctly instructed the jury on the TVPA *mens rea* requirement—it not only stated the standard correctly, it addressed every concern that Rubin complained of, instructing the jury repeatedly on Rubin's required state of mind. Even if the charge was somehow wrong, the repeated instructions on consent and the nature of the testimony at issue makes any error harmless. While, as discussed further below (*see* Argument II), Rubin's understanding of the TVPA itself is incorrectly narrow, the specific issue he claims about in the charge was, in fact, repeatedly charged to the jury. Jury instructions merit reversal "only if the charge itself, taken as a whole, was prejudicial." *United States v. Munoz*, Fed. Appx. 547 (2d Cir. 2019) (quoting *United States v. Brutus*, 505 F.3d 80, 85 (2d Cir. 2007)). The party challenging a jury instruction has the "burden of demonstrating prejudice requiring reversal." *Renz v. Grey Advert.*, 135 F.3d 217, 223 (2d Cir. 1997) (quoting *Hygh v. Jacobs*, 961 F.2d 359, 365 (2d Cir. 1992)). An "omission" or "incomplete instruction" is "less likely to be prejudicial than a misstatement of the law." *Lore v. City of Syracuse*, 670 F.3d 127, 156 (2d Cir. 2012); *see* Fed. R. Civ P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.")

## A. THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY ON THE *MENS REA* REQUIREMENT UNDER THE TVPA

The District Court correctly and in detail instructed the jury on the *mens rea* requirement under the TVPA. The jury charge included numerous instructions on consent, making clear repeatedly that it was a complete defense and that Rubin was not liable if the acts were consented to. There was no reasonable interpretation of the instructions that would have allowed the jury to "find liability without determining whether Rubin knew or recklessly disregarded that each Plaintiff withdrew her consent at some point during the encounter." (Br. at 29.)

Indeed, the specific language that Rubin complains of in the jury charge, by itself, told the jury *four times* that if the plaintiff at issue consented, it could not find Rubin liable:

> If you find that [i] *plaintiff consented* to a commercial sex act, *then the defendant doesn't have the requisite knowledge for liability* under the sex trafficking law. In other words, [ii] *if the plaintiff you're considering consented to engage in a commercial sex act about which you've heard evidence, then her claim under this cause of action fails*. That is, [iii] *consent is a complete defense to this cause of action*. … Consent isn't permanent; [iv] *if a person willingly agrees to engage in a commercial sex act, but later changes her mind, and then is forced to continue to engage in a commercial sex act against her will by force, threat of force, fraud or coercion, then a commercial act becomes involuntary, not with consent*.

(A-703-04.) It is not entirely clear that this instruction—or the numerous other charges on consent, including providing examples about withdraw of consent (*see*

29

A-705)—were even necessary to address Rubin's concern, as the charge on the third

element of the TVPA made repeatedly clear the required state of mind of Rubin:

> Now, the third element that the *plaintiffs have to prove*, and by a preponderance, to support their claim for sex trafficking is that the defendant engages in any of the acts that I mentioned to you, that long list of words before, and *that **the defendant knows or recklessly disregards** the fact that force, the threat of force, fraud or coercion, will cause the plaintiff to engage in a commercial sex act in which the plaintiff would not otherwise have willingly engaged*. In other words, *the **defendant's actions must show that the defendant knows or recklessly disregards** the fact that the conduct in which the defendant engages will, through force, threat of force, fraud or coercion, cause a person to engage in a commercial sex act against their will*.

(A-702, SA-100 (emphasis added).)

Rubin's theory that consent must be specifically communicated under the TVPA is

not only moot on the facts that the jury heard (as discussed below, the jury heard

evidence that the plaintiffs had communicated consent), it's also incorrect under the

TVPA. TVPA does not require that a victim affirmatively convey a lack of

consent—the recklessness standard specifically covers situations where a defendant

acts knowingly or recklessly that there is not consent.  In the broad purpose of the

TVPA, this would cover situations such as customers of a commercial sex

establishment ignoring red flags that the workers were not willingly there. It also

covers specific situations where a defendants ignores clear signs such that consent

does not exist.

     To the extent that Rubin's argument is that the practice of BDSM complicates

the factual analysis of his state of mind, he is correct—but that doesn't change the law; it only presents a fact question for the jury of who to believe. Rubin cannot as a matter of law avoid liability by making it impossible to communicate consent, either physically through ball gags or conceptually by the idea that any protestations made by the women were BDSM role playing. Even interpreting the evidence favorably to Rubin—and assuming that he did not intentionally lie to women to rape them—he at minimum repeatedly put himself in situations where it was difficult to gauge consent and ignored established BDSM cultural rules designed to protect in such a situation.

Rubin's primary complaint seems to be that the District Court did not repeat the recklessness language each time that consent was discussed. But that is not the law: Rubin does not dispute that jury instructions are to be considered as whole. And while Rubin makes much of the fact that the instructions on common law torts contain more instructions on consent, that is because the TVPA already has a *mens rea* requirement as an element, which largely overlaps with any consent defense.

Taken as a whole, there is no reasonable way for a juror to interpret these instructions as stating that "if a Plaintiff withdrew her consent at any point then Rubin could be liable if he continued to engage in rough sexual relations with her, regardless of whether he knew consent had been withdrawn." (Br. at 30.) The recklessness instruction addresses specifically that situation: if a plaintiff had

withdrawn consent, then recklessness applies.

## B. IF ANY ERROR DID EXIST IN THE INSTRUCTIONS, AND IT DID NOT, SUCH ERROR WAS HARMLESS AND NOT PREJUDICIAL

Even if there was an error in the instructions—and, as discussed above, there was not—any such error was harmless as the jury would have reached the same result under Rubin's preferred instructions.

As the District Court recognized in rejecting this argument, the evidence that Rubin had at least recklessly disregarded a withdraw of consent was so strong that the District Court "almost could have directed a verdict in plaintiffs' favor as a matter of law." (SA-115.) Rubin even conceded that the jury had apparently conceded that each Plaintiff had withdrawn her consent. (*Id.*) And, as even the brief summary of several encounters discussed above show, Rubin would habitually quickly escalate sexual situations to include extreme restraints and beatings without discussing any of the specifics with the women. If the jury credited the testimony of Plaintiffs-Appellees, as they must have in reaching their verdict, the most plausible conclusion was that Rubin either knowingly exceeding what the he must have known the women were expecting, or was shockingly reckless at understanding what the women were communicating, experiencing, and consenting to.

Nothing in Rubin's brief on appeal corrects these failures. Indeed, Rubin's claimed error in the jury instructions, even on their face, apply to only an extremely

narrow situation: one in which a plaintiff secretly withdrew consent but failed to communicate this to the defendant. That is not the case here—the evidence that the jury heard included extensive communications of withdraw of consent, whether in unambiguous verbal form or, due to use of ball gag, tape, or other restraints, other form that Rubin should have recognized. So for Rubin's theory to even start to apply, the jury would have had to think that each Plaintiff-Appellant was lying about communicating consent, but testifying truthfully about withdrawing consent. This incredibly unlikely conclusion does not come close to the "more likely than not" standard of showing prejudice.

But even in the very unlikely event that the jury reached this conclusion—that the plaintiffs had secretly refused consent without Rubin have any way of knowing—then they would have not found for the plaintiffs in the TVPA claim at all, because they were instructed that the third prong of TVPA liability required Rubin to at least recklessly know that the sex acts were only continuing because of his use of form..

Rubin gives no explanation what the jury could have believed to reach some a conclusion, let alone enough to meet the standard to show that it is not harmless error. All Rubin points to is the fact that each of the Plaintiff-Appellants had initially communicated consent to have sex with Rubin by agreeing to come to Rubin's apartment. (Br. at 33-34.) The jury was correctly instructed on consent.

## II.     RUBIN'S CONDUCT WAS SQUARELY COVERED BY THE TVPA

Rubin's conduct was, as the jury and District Court correctly found, squarely covered by the TVPA. In addition to, despite his many protestations, the fact that Rubin's conduct falls squarely within the conduct intended to be covered by the TVPA, Rubin's conduct also falls squarely within the text of the statute.

Rubin's argument fails as to the text of the TVPA for two reasons. First, even if the TVPA did require the requisite state of mind before any sexual encounter begins—something not supported by the TVPA itself in any way—the jury could reasonably find that Rubin possessed the state of mind before at least one encounter with each Plaintiff-Appellant. This was not a case about a single encounter with a single plaintiff: the jury heard evidence that Rubin had engaged in very similar behavior with all six Plaintiff-Appellants, and had stuck to and if anything doubled down on his modus operandi as women told him his, as they testified, that they had communicated to him to stop. *See United States v. Chang Ru Meng Backman*, 817 F.3d 662, 666–67 (9th Cir. 2016) (recognizing that 18 U.S.C. § 1591(a) "knowing" requirement does not require a forced sex act to even occur—only that defendant is "aware of an established modus operandi"); *Noble v. Weinstein*, 335 F. Supp 3d 504, 517 (S.D.N.Y. 2018) ("The plain language of Section 1591(a) requires Plaintiff to plausibly allege knowledge, or a *modus operandi* . . . .") As the District Cout analyzed at length in its Post-Trial Order, a reasonable jury could have found that

Rubin was, at best, "kidding himself" if he believed that the women he was signing up for what he called "rough sex" would continue to consent once they found out the full extent of what he intended. (SA-111.)

Second, the TVPA does not require the requisite state of mind at the time of recruitment. Its *mens rea* requirement is satisfied when a person "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person" while either "knowing" or "in reckless disregard of he fact" that "means of force, threats of force, fraud, coercion . . . or any combination of such means will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a). As the District Court correctly noted, Rubin's temporal argument does not apply to "harboring," "obtaining," or "patronizing." (SA-112.) While Rubin is correct that the TVPA has a temporal component to these verbs as well, but there is no specific time or cooldown period: if a person harbors and force is used moments later, it is satisfied. *See generally United States v. Mulder*, 273 F.3d 91, 117 (2d Cir. 2001) (noting in non-TVPA context, "the length of time of premeditation is not material"). And Rubin's argument that none of these verbs were satisfied was not raised below and inconsistent with their definition in the jury charge to which Rubin did not object.

A. THE JURY HEARD EXTENSIVE EVIDENCE SHOWING THAT, AT
THE TIME OF ENTICEMENT, RUBIN HAD THE NECESSARY
MENTAL STATE

Ample evidence existed that, at the time of enticement, Rubin had the necessary mental state.

The *mens rea* prong of the TVPA does not require "certainty as to a future act." *Noble v. Weinstein*, 335 F. Supp. 3d 504, 518 (S.D.N.Y. 2018) (quoting *United States v. Todd*, 627 F.3d 329, 333-34 (9th Cir. 2010)). Instead, it is enough if the defendant was "aware of an established modus operandi that will in the future cause a person to engage in prostitution." *Todd*, 627 F.3d at 334 (affirming necessary state of mind under TVPA where defendant "had an established practice" from which the jury could conclude that the defendant knew "he would follow the same pattern").

Instead, Rubin's argument is, as the District Court correctly categorized it, "a factual issue for the jury." (SA-112.) Rubin's view seems to be that, because each of the Plaintiff-Appellees initially consented—and had agreed to vague "rough sex"— then Rubin could not have been aware that force would later be used. (Br. at 35-36.) But that is not the standard, and it is common for sex trafficking to involve initial consent to lure victims in. *See, generally, Noble*, 335 F. Supp 3d at 523 (rejecting similar argument to apply TVPA to claimed "consensual sexual activity").

Here, Rubin had an established pattern. The jury heard testimony of strikingly similar incidents over the course of years. After Brittany Hassen's September 2011

encounter—in which she testified that Rubin stopped the encounter when she was "crying hysterically" (A-561)—the jury could have found that Rubin was reckless in continuing to proceed in his practice. And, as the instances mounted, the jury could have even more easily reached this conclusion. As the District Court correctly noted, this presents a factual question of "[h]ow many women have to tell Rubin to stop before he gets the message that when he's bringing them to New York to do the things he's doing, they felt forced into doing these things?" (SA-111.) As the District Court further recognized, the jury could reasonably find that Rubin was "kidding himself, *i.e.*, that he was certainly reckless" if he himself failed to recognize that pattern. (id.)

## B. RUBIN'S STATE OF MIND WAS RELEVANT NOT ONLY AT ENTICEMENT, BUT AT OTHER KEY POINTS UNDER THE TVPA

While the jury could certainly have found that Rubin had the requisite mental state at the time that each woman was recruited, it did not have to do so in order to find Rubin liable. The TVPA also applies if a person has the requisite state of find at the time he is "harbor[ing]," "obtain[ing]," "maintain[ing]" or "patroniz[ing]" a person. Except for "patronize," which the jury was free to assume its usual meaning, each of these terms was defined in the jury charge, to which Rubin did not only not object, but nearly identical definitions were proposed by his co-defendant Powers in a letter to which Rubin himself joined:

- "To **harbor** a person means to provide shelter to that person."

37

- "To **obtain** a person means to acquire control or to possess that person." And

- "To **maintain** a person means to pay for the upkeep of that person or to put care and work into that person." (A-701.)

All four of these verbs—patronize, harbor, obtain, and maintain—could reasonably be applied to any number of events while the women were in Rubin's apartment, often restrained, and being forced to engage in sex against their will. For instance, Rubin "harbored" them by providing them shelter in his apartment; he "obtained" them both by "aquir[ing] control" by physically restraining them, along with the long history of "possess" to refer to sexual intercourse; and he "maintain[ed]" and "patron[ized] them through payment.

Rubin's new theory that these terms have some specific terms of art in the trafficking context is not just, as discussed below, unsupported, it is also untimely and thus waived. Rubin never objected to the inclusion or definition of these terms in the jury charge. *See Gelb v. Bd. Of Elections*, 47 Fed. Appx. 10, 11 (2d Cir. 2002) (objections to jury instructions "waived if they are not made contemporaneously" unless they "would result in a miscarriage of justice or in an obvious misapplication of the law," a "high standard") (citing Fed. R. Civ. P. 51; quoting *Johnson v. New York Hosp.*, 96 F.3d 33, 34 (2d Cir. 1996)). If Rubin believed that these definitions were inapplicable or misleading, he had his chance to raise it and did not—instead, he affirmative joined in

38

Even if Rubin's arguments were timely, they are also wrong. "Patronize" does not necessary require that one be a "regular" customer,[5] and Rubin offers no temporal argument as to why "patronizing" must happen before the start of an individual sexual encounter—logically, it would take place before each individual sex act. (*See* Br. at 38.)

Rubin admits that "harbor" means to "shelter" or "provide with temporary quarters"—something satisfied on its face by hosting women in his apartment. (*see id.*) Rubin's added distinction that "harbor" in the TVPA context requires that a defendant harbored women "against their will" and "compelled them to engage in commercial sex" is not supported by any of Rubin's cases. And even if it was the required definition, the jury heard evidence that Rubin *did* hold women against their will and compel them to engage in commercial sex.

To the extent that Rubin is arguing that "harboring" requires that the harbored person stay overnight—and thus any "harboring" occurred after the forced sex acts took place"—that requirement has no basis. To provide shelter simply means to provide indoor protection from the elements, and "harbor" specifically is used in phrases such as to "harbor a fugitive,"[6] which logically doesn't have any requirement

---

[5] American Heritage Dictionary 5th edition 2022 ("To go to as a customer, *especially on a regular basis*") (emphasis added), available at https://ahdictionary.com/word/search.html?q=patronize (last visited Feb. 3, 2025).
[6] American Heritage Dictionary 5th edition 2022, available at https://ahdictionary.com/word/search.html?q=harbor (last visited Feb. 3, 2025).

of an overnight stay. And says nothing at all about "obtain" or "maintain."

## C. RUBIN'S MISPLACED POLICY ARGUMENTS ARE UNAVAILING

Rubin's theory that the TVPA does not apply where a person previously agreed to a commercial sexual encounter has no basis under the TVPA.

First, the relevant language of the TVPA covers sex *acts*, not sexual *encounters*. *See* U.S.C. s. 1591(a). A "sex act" under the TVPA is broadly interpreted to generally include any "act performed with another for sexual gratification." *Noble v. Weinstein*, 335 F. Supp. 3d 504, 523 (S.D.N.Y. 2018); *see Ardolf v. Weber*, 332 F.R.D. 467, 478 (SD.N.Y. 2019) (reading "any" in "any sex act" to have an "expansive" meaning, including in that particular case "grabbing" of "genitals"); *see also United States v. Bazar*, 747 Fed. Appx. 454, 456 (9th Cir. 2018) (recognizing that "sex act" is not "limited to sexual intercourse").

In other words, a sexual encounter can and typically does include numerous individual sex acts. So using these proper definitions, Rubin's argument is that if a person agrees to participate in a commercial sexual encounter generally, there cannot be TVPA liability if they are forced to perform certain sex acts against their will. But this language is nowhere in the TVPA: it specifically covers forced sex *acts.*

To the extent that Rubin argues, divorced from the statutory text, that his behavior was not "typical" sex trafficking, as the District Court observed, that is simply wrong. The evidence showed that Rubin lured vulnerable women to engage

in commercial sex acts without their consent—Rubin's insistence that the facts show consensual commercial sex is a version of events that the jury soundly rejected.

In addition to its broad text, the legislative history of the TVPA shows that it is intended to be applied broadly where appropriate. Congress has consistently expanded to TVPA to further expand its scope. For instance, in 2008, the TVPA was amended to add the recklessness standard. William Wilberforce Trafficking Victims Reauthorization Act of 2008, Pub. L. No. 110-457, at 222(5)(A). Then in 2015, the TVPA was amended to add the verbs "solicits" and "patronizes" to the prohibited activities, in order to "*mak[e] absolutely clear* for judges, juries, prosecutors, and law enforcement officials that criminals who *purchase sexual acts* from human trafficking victims may be arrested, prosecuted, and convicted as sex trafficking offenders when this is merited by the facts of a particular case." Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, at 109(4) (emphasis added).[7]

And, importantly, the TVPA does not apply anything close to a "strict liability" standard (Br. at 41) because it requires at least a reckless state of mind in addition to, among other requirements, a commercial sex act. It specifically applies a higher standard of care to those who patronize commercial sex workers—a

---

[7] The same act also made clear that Congress had intended a broad reading of the verb "obtain": "while use of the word 'obtains' in section 1591, United States Code, has been interpreted, prior to the date of enactment of this Act, to encompass those who purchase illicit sexual acts from trafficking victims, some confusion persists" *Id.* at 109(2).

particularly vulnerable group—to ensure that they are participating willingly. And Rubin was far more involved in the scheme than mere reckless purchasers of sex acts from trafficked persons—who Congress has specifically expanded the TVPA's scope to cover. Rubin was personally involved at all stages of his encounters with these women. Rubin faces far less "strict liability" than a customer who recklessly disregards bruising or other warning signs that a person has been forced into sex. And even if such persons are rarely prosecuted, Congress has unambiguously put such persons on notice that they face the risk of serious criminal liability by engaging in those activities. *See, e.g., M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 968 (S.D. Ohio 2019) (TVPA liability where defendants "were on notice about the prevalence of sex trafficking generally at their hotels and failed to take adequate steps to train staff in order to prevent its occurrence" despite lack of actual knowledge).

Rubin's conduct properly falls under the TVPA

## III. THE JURY HAD MORE THAN SUFFICIENT EVIDENCE TO REACH ITS VERDICT

The jury had more than sufficient evidence to reach its verdict as to all Plaintiffs-Appellees. As Rubin admits, a verdict may "only" be overturned if there is "a complete absence of evidence supporting" the jury's verdict. *Gronowski v. Spencer*, 424 F.3d 285, 291 (2d Cir. 2005) (quoting *LeBlanc–Sternberg v. Fletcher*,

67 F.3d 412, 429 (2d Cir. 1995). It is well-settled that juries have great discretion, even in criminal trials with a substantially higher burden of proof, to resolve issues of credibility, of potentially inconsistent testimony, and resolve inferences of fact. *See, e.g., United States v. Tropiano*, 418 F.2d 1069, 1074 (2d Cir. 1969) ("it is the province of the jury and not of the court to resolve discrepancies in a witness' testimony which in any way reflect upon his credibility" as well as "to choose between competing inferences of fact"); *United States v. Josephberg*, 562 F.3d 478, 481 (2d Cir. 2009) ("when testimonial inconsistencies are revealed on cross-examination, the jury is entitled to weigh the evidence and decide the credibility issues for itself"; jury is the "arbiter of the truth"); *United States v. Cote*, 544 F.3d 88, 99 (2d Cir. 2008) ("The court must give full play to the right of the jury to determine credibility . . . .").

The District Court correctly rejected this same argument from Rubin in its Post-Trial Order as "perfunctory." (SA-116.) Tellingly, Rubin does not cite a single case in his argument on this point, let alone anything that would justify a reversal of a jury verdict of such pure issues of facts. (Br. at 42-49)

The jury heard overwhelming evidence from Plaintiff-Appellees as to the events at issue, at minimum satisfying all required elements. The Plaintiff-Appellees certainly all testified to communication of a lack of consent in one form of another, even if "only" through methods such as screaming as if in shock. And even if that

was not the case, the jury could have found that Rubin was reckless simply by virtue of his M.O. of vague disclosures followed rapid escalation into such extreme behavior as beating women for 40 minutes. The broad language of the TVPA is specifically designed to allow these sort of complicated, fact-specific questions—often concerning questions of social cues and body language from years earlier—to be evaluated by the sound discretion of a jury.

A. LYTELL

As discussed further above (*supra* at Statement of Facts), the jury heard extensive testimony as to Lytell's encounter with Rubin. This included testimony that Rubin had punched and penetrated her without asking permission; had punched her for forty minutes before pushing her down to penetrate her; and used tape to restrain her.

Rubin admits that "Lytell testified that she told Rubin to stop punching her in the back of her head and to stop penetrating her." (Br. at 44.) Rubin simply argues that Lytell's testimony was "undermined" by supposedly contradictory communications. (*Id.*) But this is exactly the sort of weighing of evidence that is the province of the jury, and Rubin does not come close to setting forth an argument to setting aside the jury's sound discretion in this instance.

B. TAGAI

As discussed further above (*supra* at Statement of Facts), the jury heard extensive testimony as to Lytell's encounter with Rubin. This included testimony that Rubin had, without permission, penetrated her vagina with a pole cue; clamped clothes pins onto her breasts; and shocked her with an electric dildo; Tagai also testified that Rubin had used a whip to repeatedly hit her in the vagina, and was not able to leave because she was "tied up."

Similar as to Lytell, Rubin here argues the substance of Tagai's credibility against his own: including that the first non-consensual encounter, involving a pool cue, which Tagai described in great detail, had never occurred. (Br. at 45.) These intensely factual questions as to credibility are, again, precisely the sort of questions within the domain of the jury, and Rubin offers no reason whatsoever why their discretion here should be overturned.

C. HASSEN

As discussed further above (*supra* at Statement of Facts), the jury heard extensive testimony as to Lytell's encounter with Rubin. This included testimony that Rubin had, without asking permission, bound her, whipped her, and penetrated her; had tied her wrists and penetrated her while she was forced face down; and was unable to leave as he was restrained.

Just like Lytell and Tagai, Rubin's challenge comes down entirely to

credibility, resolution of conflicting testimony, and factual inferences, and reasons why this factual dispute is sufficiently different to merit a departure from the rule, especially when the District Court—having observed all live testimony—saw no reason to disturb to jury's verdict.

Nothing raised by Rubin even comes close to the level required to reverse a jury and trial court on highly fact specific issues such of these.

## IV.  PUNITIVE DAMAGES ARE AVAILABLE UNDER THE TVPA

The District Court's finding that punitive damages, consistent with every Court of Appeals to consider the issue, should be affirmed. As the District Court recognized, each Court of Appeal that has considered this issue has upheld the availability of punitive damages under the TVPA. The Fourth and Fifth Circuit Courts of Appeal have affirmed TVPA judgments that included punitive awards, and the Tenth and Ninth Circuits have carefully analyzed the issue. *See Warfaa v. Ali*, 1 F.4th 289, 293-96 (4th Cir. 2021); *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 206 (5th Cir. 2017); *Francisco v. Susano*, 525 Fed. Appx. 828, 834 (10th Cir. 2013); *Ditullio v. Boehm*, 662 F.3d 1091, 1096-1102 (9th Cir. 2011); *Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 17-cv-1302, 2019 WL 4647648, at *18 (E.D.N.Y. Sept. 24, 2019).

The flaw in Rubin's argument is that he has it backwards, as both *Francisco* and *Ditullio* found in analyzing *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60

(1992), whose general rule Rubin states but fails to address its interpretation by the other Circuit Courts. (*See* Br. at 50.) As *Francisco* and *Ditullio* both recognized, "damages" by itself is a term that encompasses compensatory damages, punitive damages, and nominal damage. *Francisco*, 525 Fed. Appx. at 833; *Ditullio,* 662 F.3d at 1096. And, as *Franklin* recognized, the "general rule" is that "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute. *Franklin*, 503 U.S. at 70-71.

Because the TVPA is in part a punitive statute, whose criminal aspect existed before its civil cause of action, allowing punitive damages—something allowable to common law torts—is a natural allowance, and certainly no reason to reverse the default rule that punitive damages are available. And, since the term "damages" by default includes punitive damages, the exclusion of the specific term in drafts indicates nothing but removing drafting ambiguities. *Snapp* is not to the contrary because there, the court recognized that the Fair Labor Standards act had a primary purpose of "compensation" and, instead of "damages" the statutory term was "legal relief." *Snapp v. Unlimited Concepts, Inc.*, 208 F.3d 928, 934 (11th Cir. 2000). The Civil Rights Act, Fair Housing Act, and Wiretap Act are similarly statutes that are arguably compensatory, so Congress may have felt the need there to spell out the availability of punitive damages.

The TVPA, by contrast, by design is of a nature to prevent certain harm which Congress found appropriate to prevent on a societal level. And even apart from its criminal statute background, the TVPA also covers situation that (as Rubin himself has acknowledged) often overlap with tort claims, where punitive damages are available. *See Francisco*, 525 Fed. Appx. at 833-34 ("the TVPA addresses tortious conduct—indeed, conduct so reprehensible Congress made it criminal even before adding the civil remedy"). The District Court properly found that the TVPA allows for punitive damages.

## CONCLUSION

For the foregoing reasons, the judgment below should stand.

Dated: February 3, 2025

Respectfully submitted,
 /s/ Matthew W. Schmidt
MATTHEW W. SCHMIDT
SCHMIDT LAW CORPORATION
*Attorneys for Plaintiff-Appellee*
  *Mia Lytell*
116A Main Street
Tiburon, California 94920
(202) 746 9110

## <u>CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE<br>OF APPELLATE PROCEDURE 32(a)</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,121 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in the Times New Roman font, size 14.

Dated: February 3, 2025

| STATE OF NEW YORK | ) | | **AFFIDAVIT OF SERVICE** |
|---|---|---|---|
| | ) | ss.: | **BY OVERNIGHT EXPRESS** |
| COUNTY OF NEW YORK | ) | | **MAIL** |

I, Tyrone Heath, 2179 Washington Avenue, Apt. 19, Bronx, New York 10457, being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age and resides at the address shown above.

**On February 3, 2025**

deponent served the within: **Brief for Plaintiff-Appellee Mia Lytell**

**upon:**

**Natasha Tagai**
**2701 Biscayne Blvd**
**Apt 8102**
**Miami, FL 33137**
*Plaintiff-Appellee Pro se*

**Brittany Reyes**
**44 Merrill Avenue**
**East Brunswick, NJ 08816**
*Plaintiff-Appellee Pro se*

**Brittany Hassen**
**2928 West 5th Street**
**Apt 7T**
**Brooklyn, New York 11224**
*Plaintiff-Appellee Pro se*

the address(es) designated by said attorney(s) for that purpose by depositing 1 true copy(ies) of same, enclosed in a postpaid properly addressed wrapper in a Post Office Official Overnight Express Mail Depository, under the exclusive custody and care of the United States Postal Service, within the State of New York.

**Sworn to before me on February 3, 2025**

**MARIANA BRAYLOVSKIY**
Notary Public State of New York
No. 01BR6004935
Qualified in Richmond County
Commission Expires March 30, 2026

**Job# 714331**