# 24-2018-cv

## United States Court of Appeals

*for the*

## Second Circuit

AMY MOORE, MIA LYTELL, NATASHA TAGAI, EMMA HOPPER,
BRITTANY HASSEN, BRITTANY REYES,

*Plaintiffs-Appellees,*

STEPHANIE CALDWELL,

*Plaintiff-Counter-Defendant-Third-Party-Defendant,*

– v. –

HOWARD RUBIN,

*Defendant-Counter-Claimant-Appellant,*

JENNIFER POWERS,

*Defendant-Third-Party-Plaintiff-Counter-Claimant,*

YIFAT SCHNUR, STEPHANIE SHON, BLUE ICARUS, LLC,
DOE COMPANY, JOHN DOE,

*Defendants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK (BROOKLYN)

## REPLY BRIEF FOR DEFENDANT-COUNTER-CLAIMANT-APPELLANT

EDWARD A. MCDONALD
BENJAMIN E. ROSENBERG
MAY CHIANG
DECHERT LLP
*Attorneys for Defendant-Counter-Claimant-Appellant*
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500

CP COUNSEL PRESS    (800) 4-APPEAL • (355588)

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................... ii

Point I ....................................................................................................... 1

    The Jury Instruction Was Incorrect And Prejudicial. Rubin
Preserved His Objection To The Incorrect Jury Instruction .......................... 1

    A.    Rubin Preserved His Objection .............................................. 2

    B.    Rubin's Proposed Jury Instruction Properly Stated the Law,
and The Trial Court's Did Not ............................................... 4

    C.    The Trial Court's Error Was Not Harmless .......................... 8

Point II ..................................................................................................... 10

    Even If Rubin's Actions Constituted Assault, They Did Not Violate
The TVPA ......................................................................................... 10

Point III ................................................................................................... 15

    The Evidence Of A TVPA Violation Was Insufficient .................................. 15

Point IV ................................................................................................... 24

    The TVPA Does Not Authorize Punitive Damages ..................................... 24

Point V ..................................................................................................... 26

    Rubin's Appendix Is Not Deficient .............................................................. 26

Conclusion ............................................................................................... 27

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anderson v. City of Bessemer City, N.C.*,
470 U.S. 564 (1985).................................................................21

*Ditullio v. Boehm*,
662 F.3d 1091 (9th Cir. 2011)....................................................25

*Doe v. Fitzgerald*,
Case No. CV 20-10713-MWF (RAOx),
2022 WL 425016 (C.D. Cal. Jan. 6, 2022) ..................................11

*Folger Adam Co. v. PMI Indus., Inc.*,
938 F.2d 1529 (2d Cir. 1991).......................................................5

*Gomes v. ANGOP*,
541 F. App'x 141 (2d Cir. 2013)..................................................26

*Hathaway v. Coughlin*,
99 F.3d 550 (2d Cir. 1996)...........................................................5

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018)....................................................9, 11

*M. Harvey Rephen & Assocs., P.C. v. Chase Bank USA, N.A.*,
853 F. App'x 690 (2d Cir. 2021)............................................ 26-27

*Murray v. UBS Securities, LLC*,
--- F.4th ---- 2025 WL 440054 (2d Cir. Feb. 10, 2025) ...........................2, 9

*Norfleet v. Isthmian Lines, Inc.*,
355 F.2d 359 (2d Cir. 1966)..........................................................6

*Price v. City of Charlotte, N.C.*,
93 F.3d 1241 (4th Cir. 1996)........................................................21

*United States v. Birbal*,
62 F.3d 456 (2d Cir. 1995)............................................................6

*United States v. Contreras*,
820 F.3d 255 (7th Cir. 2016)........................................................16

*United States v. Hodge*,
594 F.3d 614 (8th Cir. 2010)........................................................16

*United States v. Lorenzo*,
    534 F.3d 153 (2d Cir. 2008) .......................................................................18

*United States v. Rodriguez*,
    727 F. App'x 24 (2d Cir. 2018) ................................................................18

*Zafiro v. United States*,
    506 U.S. 534 (1993) ....................................................................................5

**Statutes & Other Authorities:**

18 U.S.C. § 1591 ..............................................................................................1

18 U.S.C. § 1591(a)(1) ..............................................................................11, 14, 15

18 U.S.C. § 1595(a) ........................................................................................25

18 U.S.C. § 2331(1) ..........................................................................................9

Federal Rule of Appellate Procedure Rule 30 ...............................................26

Restatement (Second) of Torts § 892 ..............................................................8

Restatement (Second) of Torts § 892A(5) ...................................................7, 8

Second Circuit Rule 30 ..................................................................................26

# POINT I

## THE JURY INSTRUCTION WAS INCORRECT AND PREJUDICIAL. RUBIN PRESERVED HIS OBJECTION TO THE INCORRECT JURY INSTRUCTION

Rubin was explicit about his desire to engage in BDSM encounters with Plaintiffs. Each Plaintiff consented, in writing, to engage in BDSM encounters with Rubin. Thereafter, each Plaintiff (except for Reyes) repeatedly agreed to engage in subsequent sexual encounters, expressing nothing short of wholehearted enthusiasm for the arrangement. Nevertheless, Plaintiffs argue that each Plaintiff withdrew her consent during the course of one or more sessions with Rubin, and Rubin therefore violated the federal Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1591 *et seq*. The trial court did not instruct the jury that to be liable under the TVPA Rubin had to know or recklessly disregard that each Plaintiff withdrew her consent. The *mens rea* element of the TVPA required the trial court to give such an instruction. The trial court's refusal to do so despite numerous requests from Rubin's counsel requires reversal, as explained in Rubin's opening brief. Def.-Appellant's Opening Br. 28–34, Dec. 3, 2024, Dkt. 47.1 (hereinafter "Rubin Br.").

In their opposition, Plaintiffs raise three arguments: (A) Rubin's argument is waived, (B) Rubin's argument is wrong, and (C) even if the jury instructions were wrong, the error was harmless. None of these arguments has merit.

1

## A.    **Rubin Preserved His Objection**

Moore's and Hopper's counsel (but not Lytell's) argues that Rubin did not preserve his objection.  Pls.-Appellees Moore & Hopper Opening Br. 37–39, Feb. 3, 2025, Dkt. 69.1 (hereinafter, "Moore & Hopper Br.").  Rubin plainly did so.

As this Court has recently stated, "[a]n objection to jury instructions is valid so long as it is clear that the trial judge was informed of possible errors in the charge and was given an opportunity to correct them."  *Murray v. UBS Securities, LLC*, --- F.4th ----, 2025 WL 440054, at *3 (2d Cir. Feb. 10, 2025) (internal quotations and citations omitted).  On March 25, 2022, Rubin proposed the following instruction: "[e]ven if you determine that a plaintiff did not consent to engage in commercial sex acts with Mr. Rubin, if the defendant you are considering reasonably believed . . . that the plaintiff consented . . . then the defendant would not have the requisite knowledge to be liable."  *See* Rubin Br. 25; Defs.' Proposed Jury Instructions 15, March 25, 2022, ECF No. 380.  Rubin raised the issue again on April 2, 2022, seeking additional language to clarify the jury instruction on the *mens rea* required under the TVPA.[1]  *See* Rubin Br. 25; Def.

---

[1]    In his letter dated April 2, 2022, Rubin requested the addition of the following language to page 19, lines 2–11 of the Court's Proposed Charge:

> The defense of consent here applies when defendant proves, by a preponderance of the evidence, that the plaintiff you are considering consented to engage in the activity or *led the defendant to reasonably believe she consented* to engage in the activity. If you find that a plaintiff consented

Rubin's Letter Objs. to Am. Proposed Jury Charge 2, April 2, 2022, ECF No. 395.

During the April 2, 2022 Charge Conference, the trial court expressly rejected Rubin's proposed instruction. Moore & Hopper Suppl. A. 2008, Dkt. 60.1–68.1 (hereinafter "Moore & Hopper Suppl. A."). Similarly, Powers' attorney requested, and the Court rejected, an instruction that "[c]onsent for this purpose is evaluated as a reasonable person in defendants' position would have understood the words, actions, or inactions by the plaintiff, dash, taken together would a reasonable person have understood them to communicate consent." Moore & Hopper Suppl. A. 2031.

Thus, the trial judge was repeatedly informed of the error, declined to correct it, and expressly acknowledged that Defendants had preserved their objections.[2]

---

*or defendant reasonably believes that the plaintiff consented,* then the defendant does not have the requisite knowledge for liability under the law – even if the belief was erroneous.

Def. Rubin's Letter Objs. to Am. Proposed Jury Charge 2, April 2, 2022, ECF No. 395 (emphasis in original).

[2]    At the outset of the April 2, 2022, Charge Conference, Judge Cogan assured the parties:

> [E]veryone should assume that to the extent I have not adopted that which you wanted me to adopt, that means I have rejected it. . . . As far as I'm concerned, you have fully preserved your rights on those issues by having submitted the proposed jury instructions and having the arguments that you've made rejected."

Moore & Hopper Suppl. A. 2007.

**B.**     **Rubin's Proposed Jury Instruction Properly Stated the Law, and The Trial Court's Did Not**

Moore, Hopper, and Lytell all argue that the jury charge "viewed as a whole, properly conveyed the applicable law to the jury."  Moore & Hopper Br. 44; *see also* Pl.-Appellee Lytell Opening Br. 29–31, Feb. 3, 2025, Dkt. 72.1 (hereinafter, "Lytell Br.").

As demonstrated in Rubin's opening brief, however, the trial court repeatedly gave the jury the incomplete and incorrect instruction that Rubin could be liable under the TVPA merely if he engaged in acts that exceeded any Plaintiff's consent.  *See* Rubin Br. 24, 29–30.  The statute requires that Rubin had to know or recklessly disregard that a Plaintiff did not consent to his behavior.  Rubin Br. 2–3, 28.  Despite Plaintiffs' characterizations, the trial court's instruction did not include the requisite *mens rea* element.  The trial court failed to instruct the jury that Rubin had to know or recklessly disregard that each Plaintiff had withdrawn her consent. *See* Rubin Br. 2–3, 24, 28.

------------------------

During the Charge Conference, the trial court again assured the parties:

> [T]he arguments have been fully made as to the defendants' points in the Rule 50 motion, not only there, but in their letters, and also in this charge conference. And to the extent I have not adopted them, it's because I have rejected them. And that's an express rejection.

Moore & Hopper Suppl. A. 2042.

The trial court's error was underscored by its proper *mens rea* instruction in response to a question from the jury that related solely to Rubin's co-defendant, Jennifer Powers, Rubin Br. 32,[3] and for the common law tort claims, Rubin Br. 30–31. The jury rejected all of the claims against Powers and all of the state tort claims against Rubin (except for one state tort claim by Moore).

"Jurors are presumed to follow their instructions." *Zafiro v. United States*, 506 U.S. 534, 540–41 (1993) (internal quotations and citations omitted), and the fact that the jurors were given a different (and proper) *mens rea* instruction with respect to the TVPA claim against Powers and the common law claims, but not with respect to the TVPA claim against Rubin, leads to the conclusion that they did not consider Rubin's *mens rea* with respect to the TVPA claim. *Cf. Hathaway v. Coughlin*, 99 F.3d 550, 552–53 (2d Cir. 1996) ("A jury charge is erroneous if it misleads the jury as to the correct legal standard, or if it does not adequately inform the jury of the law.") (internal quotations and citations omitted); *Folger Adam Co. v. PMI Indus., Inc.*, 938 F.2d 1529, 1534 (2d Cir. 1991) (remanding for a new trial in light of the appellate court's function to "satisfy itself that instructions

---

[3]      Moore and Hopper (but not Lytell) contend that the response to the jury note was "not limited to Powers," Moore & Hopper Br. 45, but that is simply not true. The jury's note asked specifically about withdrawn consent in connection with "the person . . . not present when the consent is withdrawn," and the trial court's answer was limited in the same way. Rubin Br. 32 (quoting jury note and trial court's instruction that began with "[w]here consent has been given and then a person is not present when the consent is withdrawn . . ."); SPA. 13.

5

. . . show *no tendency* to confuse or mislead the jury as to the principles of law which are applicable.") (quoting *Norfleet v. Isthmian Lines, Inc.*, 355 F.2d 359, 362–63 (2d Cir. 1966)).

This distinction between the two instructions was highlighted by the trial court when he told the jury that "a consent defense for assault *is a little bit different from a consent defense for sex trafficking* by force, fraud or coercion. The defense of consent here applies when the defendant proves, by a preponderance of the evidence, that the plaintiff you are considering consented to engage in the activity *or led the defendant to reasonably believe that she consented to engage in the activity*." A. 708 (emphasis added); *see* Rubin Br. 30–31. The trial court's instruction ensured that jurors would consider consent differently when considering the state tort claims as opposed to the TVPA claims, a distinction entirely without support in the law. *Cf. United States v. Birbal*, 62 F.3d 456, 460, 465 (2d Cir. 1995) (remanding for a new trial where the district court's conflicting instructions on the standard of proof "must have left the jury uncertain of the standard it was charged with applying").

Lytell's argument that the trial court properly instructed the jury that Rubin had to know or recklessly disregard that force, the threat of force, fraud, or coercion "will cause the plaintiff to engage in a commercial sex act," Lytell Br. 30

(quoting A. 702, SPA. 100), and that consent was "a complete defense to this cause of action [*i.e.*, the TVPA]," Lytell Br. 20 (quoting A. 703–04), is wrong.

The trial court's instructions on consent conflated Plaintiffs' state of mind with Rubin's: "If you find that a plaintiff consented to a commercial sex act, then the defendant doesn't have the requisite knowledge for liability under this sex trafficking law." A. 704. That instruction left open the possibility—which was precisely what Rubin was challenging—that if a Plaintiff withdrew her consent, Rubin could be liable regardless of whether he knew or recklessly disregarded that she withdrew consent. Thus, the jurors were never instructed properly on Rubin's *mens rea* with respect to the withdrawal of consent on the TVPA claim.[4]

In fact, counsel for Moore and Hopper lends support to Rubin's argument about what the jury instruction should have been. The opposition brief quotes a comment to the Restatement [Second] of Torts, § 892A[5], to explain that "consent is terminated when the actor [*i.e.*, Rubin] knows or has reason to know that the other [*i.e.*, the plaintiff in question] is no longer willing for him to continue the

---

[4] In his Memorandum Decision and Order on Attorneys' Fees, the trial court stated that plaintiffs "also had to show that a *reasonable person in defendant's position would have known* that the abuse to which he subjected them was more than that to which they had consented." Mem. Decision & Order on Att'ys' Fees 10, Feb. 14, 2025, Dkt. 466 (emphasis added). That is exactly what Rubin sought in his proposed jury instructions, but it is not what the trial court instructed the jury.

particular conduct." Moore & Hopper Br. 43.[5] That language, which focuses on Rubin's state of mind, and not the Plaintiffs', is indeed correct, and should have been—but was not—communicated to the jury.

## C. **The Trial Court's Error Was Not Harmless**

Lytell, Moore, and Hopper argue that any error in the jury instructions with respect to Rubin's *mens rea* was harmless. According to Lytell, the jury was properly instructed that there could be no TVPA liability with respect to activities to which Plaintiffs consented, and therefore the jury must have credited Lytell's testimony that she had withdrawn her consent. Lytell Br. 33. According to Moore and Hopper, any error in the charge on Rubin's *mens rea* was cured by the instructions "that consensual BDSM activities alone could not constitute the basis for a conviction under the sex trafficking charge" and "that consent could serve as a defense." Moore & Hopper Br. 44.

---

[5]     Indeed, Moore and Hopper's citation to the comment to the Restatement [Second] of Torts, § 892A[5] is entirely consistent with Powers' and Rubin's first proposed jury instruction on consent as a defense to the TVPA. Powers cited to the Restatement (Second) of Torts § 892, which states: "If words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are as effective as consent in fact." *See* Powers' Proposed Instruction on Consent, Mar. 31, 2022, Dkt. 392-1. Rubin joined in this instruction. Rubin's Letter re Jury Instructions, Mar. 31, 2022, Dkt. 394 (joining in Powers' Proposed Instructions). The trial court, however, rejected this instruction to the jury with respect to the TVPA claims.

8

Plaintiffs' arguments miss the point, which is that the TVPA includes a *mens rea* element regarding consent, and the instructions omitted that element. "[W]here jury instructions create an erroneous impression regarding the standard of liability, it is not harmless error because it goes directly to plaintiff's claim, and a new trial is warranted." *Murray v. UBS Securities, Ltd.*, --- F.4th ----, 2025 WL 440054, at *3 (2d Cir. Feb. 10, 2025) (internal quotations and citations omitted). Where, as here, it cannot be determined whether a properly instructed jury would have reached the same verdict, such an erroneous charge requires vacatur and remand. *Linde v. Arab Bank, PLC*, 882 F.3d 314, 327 (2d Cir. 2018) (holding jury instruction that erroneously omitted the statutory intent element required vacatur and remand because this Court could not conclude that a properly instructed jury would have found the appellant liable under the statute).

Although never mentioned by Lytell, Moore, or Hopper, there was substantial evidence that even if the Plaintiffs withdrew their consent at any point, they did not do so in such a manner that Rubin understood or was reckless in not understanding that they were withdrawing consent. Each Plaintiff expressly agreed to engage in BDSM through their extensive texts and conversations with Rubin before the encounters, through their signing of the consent agreements, and, in most instances, through their prior BDSM encounters with Rubin. Moreover,

although Rubin gave each Plaintiff a safe word, only Reyes testified that she used it. *See* Rubin Br. 9; A. 396, 422–23. That every Plaintiff except Reyes expressed enthusiasm about the encounters immediately thereafter, and sought to (and did) return for additional encounters, also suggests that their expressions of withdrawal of consent, asserted for the first time in the context of litigation, were not so unequivocal that Rubin would necessarily have understood them or been reckless in not understanding them. Thus, in this highly unique context, where participants provided positive reinforcement before and after repeated BDSM encounters, a jury could reasonably find that Rubin did not understand, or did not recklessly disregard, Plaintiffs' actions during the encounters to constitute withdrawal of consent.

## POINT II

## EVEN IF RUBIN'S ACTIONS CONSTITUTED ASSAULT, THEY DID NOT VIOLATE THE TVPA

As noted, the gravamen of each Plaintiff's TVPA claim is not that she was forced or deceived into commencing the encounter(s), but that at some point during an encounter Rubin went "too far" and she withdrew her consent. Indeed, each Plaintiff commenced her sexual encounters with Rubin knowing that he intended to engage in BDSM with them. Rubin Br. 8–22 (collecting evidence). He was explicit in his texts and conversations, and he provided an equally explicit

10

agreement that each Plaintiff signed. *Id.* None suggested that she was coerced into having sexual relations with Rubin, and some of them (Tagai, Hopper, and Hassen) had multiple BDSM encounters with Rubin over a period of years. *Id.* Lytell persistently and repeatedly sought subsequent encounters, and, like Moore, recruited close friends to also have encounters with Rubin. *Id.*

Even if any Plaintiff withdrew her consent during an encounter and Rubin knew it, his actions would not constitute a TVPA violation, but rather an assault— more colloquially, "date rape"—which is not the same as a TVPA violation. The TVPA covers persons who commit certain acts knowing or recklessly disregarding that means of force, fraud, or coercion "will be used" to cause a victim to engage in a commercial sex act. *See* 18 U.S.C. § 1591(a)(1). Courts have focused on the statute's use of the future tense to uphold convictions in which no commercial sex acts occurred but were merely intended to occur. *See* Rubin Br. 35 n.11 (collecting cases); *see also* Rubin Br. 38–39 (discussing *Doe v. Fitzgerald*, Case No. CV 20-10713-MWF (RAOx), 2022 WL 425016, at *8 (C.D. Cal. Jan. 6, 2022) (distinguishing date rape from a TVPA charge, and finding that the complaint pled only the former because even though the defendant allegedly overcame his victim's consent during a sexual encounter at a party, "[t]o be liable under the TVPA, Defendant must have invited Doe No. 10 to the party with knowledge that force,

11

threat, or coercion would be used against her to perform a commercial sex act")). There is no evidence that when Rubin invited Plaintiffs to his apartment to engage in sexual relations he knew or recklessly disregarded that they would withdraw their consent and be coerced into certain sexual acts. Even if he overcame their will at some point during the sexual encounters, that does not constitute a TVPA violation.

Moore and Hopper never face this argument head-on, and never address the authorities Rubin cited in his opening brief. Instead, they observe that "one way of demonstrating . . . knowledge is by demonstrating" a *modus operandi*. Moore & Hopper Br. 51. Lytell, too, makes the *modus operandi* argument, citing the trial court's finding that "a reasonable jury could have found that Rubin was, at best, 'kidding himself' if he believed that the women he was signing up for what he called 'rough sex' would continue to consent once they found out the full extent of what he intended." Lytell Br. 34–35.

But, the only *modus operandi* established was that Rubin was explicit in his dealings with potential sexual partners—including warning them in writing that he would engage in "total BDSM" and specifically describing certain BDSM activities that he liked. A. 759–60; 869. As Rubin testified, he did not want to engage in BDSM activities with partners who would be unwilling or reluctant. *See* A. 631–32. The *modus operandi* argument falls flat in light of the evidence that

12

Plaintiffs indeed consented to numerous BDSM encounters with Rubin. Hopper herself (and other Plaintiffs, such as Tagai) testified to numerous BDSM encounters over lengthy periods about which they had no complaints, and Lytell, Moore, and Hassen all sought BDSM encounters with Rubin *after* the allegedly non-consensual encounters.

Lytell's reliance on a single instance in 2011 involving Hassen to attempt to establish a "pattern" of sex trafficking is unavailing. After beginning an encounter with Rubin, Hassen decided that she did not want it to continue, asked Rubin to stop—and Rubin stopped. Lytell Br. 36–37; *see also* Rubin Br. 18 (describing the incident). That single instance with Hassen—who later persistently sought out Rubin to continue the relationship—could hardly have put Rubin on notice that all of his sexual encounters with different women and at different times and involving different kinds of BDSM activity would be non-consensual. It showed only that on a single occasion one partner did not wish to continue, and Rubin stopped. Rubin Br. 18.

Lytell argues that "as the instances mounted, the jury could have even more easily reached" the conclusion that "Rubin was reckless in continuing to proceed in his practice." Lytell Br. 37. But, Plaintiffs claim 12 allegedly wrongful instances[6]

---

[6] Moore 2; Lytell 1; Tagai 3; Hopper 1; Hassen 4; Reyes 1. *See* Rubin Br. 9–22.

over a seven year period[7] during which Rubin had numerous innocuous BDSM encounters with Plaintiffs and others. *See* A. 627–29, 639 (Rubin testimony about his BDSM partners). And it is not clear what "practice" Lytell refers to. If she is arguing that the fact that some women, on some occasions, objected to certain actions that Rubin took, that hardly shows that he knew before any BDSM encounter that force, fraud, or coercion *would be used* in the encounter, or that it would be reckless for him to engage in BDSM in any form or circumstance.

Lytell also argues that at some point during the sexual encounters Rubin knew that he would use force to overcome a Plaintiff's withdrawal of consent, and at that moment he was "harbor[ing]," "obtain[ing]," or "maintain[ing]" that Plaintiff, and therefore his behavior violated the TVPA. Lytell Br. 37–40; *see* 18 U.S.C. § 1591(a)(1). As Rubin argued in his opening brief, allowing this interpretation of the TVPA would turn every assault of a commercial sex worker into a TVPA violation. Such an interpretation is contrary to the plain language of the TVPA.[8] The statute requires actions "in or affecting interstate . . . commerce,"

---

[7]     Tagai testified that her relation with Rubin began in 2010 and continued through July 2017; Hassen's was from 2011 through 2014; Moore, Lytell and Reyes saw Rubin in 2016; Hopper saw him from 2015 through 2017. Rubin Br. 9–22.

[8]     Lytell argues that Rubin is making a "policy argument" that the TVPA should not extend to such situations, Lytell Br. 40–42, but that is incorrect: Rubin's argument is that under the well-established principle that criminal statutes are to be narrowly construed, the TVPA should not be read to lead to the

14

and the "harbor[ing]," "obtain[ing]," and "maintain[ing]" that Lytell relies on took place entirely in Rubin's apartment in New York. *See* 18 U.S.C. § 1591(a)(1). There was no showing that it affected interstate commerce.[9]

## POINT III

## THE EVIDENCE OF A TVPA VIOLATION WAS INSUFFICIENT

*Moore* – Moore contends that there was sufficient evidence to uphold the verdict on the TVPA, but she both mischaracterizes the evidence and fails to cite the documentary evidence that contradicts her claim.

With respect to her first encounter with Rubin (August 2016), she contends that she was not free to leave and did not consent to being tied up. Moore & Hopper Br. 53. But Moore never claims that she *asked* to leave, and there is no evidence that she did. *See* Rubin Br. 10–11. With respect to her second sexual encounter (December 2016), Moore relies on the implausible story that she went to Rubin to ask for money for injuries she allegedly sustained in the original

---

extraordinary result of making virtually all assaults on commercial sex workers punishable by federal criminal law. Rubin Br. 40–41.

[9]     Rubin's alleged "recruit[ment]," "entice[ment]," and "transport" of Plaintiffs may have effected interstate commerce—for example, when he paid for Moore and Lytell to fly to New York for their encounter with Rubin in August 2016—but there was never any evidence that when he caused them or any other Plaintiff to come to New York he knew that force, fraud, or coercion would be used. The evidence shows that based on his prior communications with them, and his previous encounters, he expected them to be consenting partners.

encounter. Moore & Hopper Br. 53–54. Leaving aside that there was no evidence of such injuries other than Moore's testimony, she did not explain why she—freely and voluntarily—met Rubin for lunch and went back to his apartment without ever making the request for money. There is no evidence Rubin asked Moore to come to New York or to have lunch or to have a sexual encounter. The testimony established that Moore "sought him out." A. 451; *see also id.* at 453 (Q: "So instead [of calling or texting to ask for money] you decided to visit him, correct?" A: "I – yes.").

Moore contends that she was forced to engage in sexual relations with Rubin "without her consent" during the sexual encounter, Moore & Hopper Br. 54, but there is no evidence that she expressed a lack of consent, and in light of her earlier sexual encounter with Rubin and her effort to initiate this encounter, Rubin had no reason to believe that she was not consenting. *United States v. Contreras*, 820 F.3d 255, 263 (7th Cir. 2016) (stating that "our decision [to credit testimony] is not a rubber stamp" and "[s]imply affixing the label 'credibility determination' will not insulate a decision from review"); *United States v. Hodge*, 594 F.3d 614, 618 (8th Cir. 2010) (finding "a more searching review warranted" where "credibility determinations are internally inconsistent, based upon incoherent or implausible testimony, or directly at odds with objective evidence").

16

Moore ignores the documentary evidence, specifically her text messages, that flatly contradict her story:

- The morning after the first encounter (August 2016), after Moore had already been paid in cash, Moore texted Rubin "Thank you for having me ! 💋," and texted Rubin's aide, Powers "[c]an't wait [to see Howie again] I was hoping he liked me," and "I would do it again it was quite the experience lol." *See* Rubin Br. 11; A. 810–11, 812.

- Moore referred Rubin to a friend of Moore's for a sexual encounter. *See* Rubin Br. 11; A. 812.

- Immediately after the second encounter (December 16), Moore texted Powers: "Hey just finished [with] howie 😊 He said you would Paypal me." *See* Rubin Br. 12; A. 816.

- Months later, she joked with her friend Lytell that she could see a client in New York with Lytell "[o]r if howie wants to beat me lol." *See* Rubin Br. 12; A. 834.

This evidence undermines the notions that Moore was forced to engage in activity against her will, that she expressed a withdrawal of consent to Rubin, or that she was otherwise the victim of a TVPA violation. And on her appeal, Moore simply ignores it. The law is clear, however, that the Court cannot ignore evidence, especially documentary evidence, for in reviewing the sufficiency of the evidence,

17

this Court evaluates the evidence "in its totality," *United States v. Rodriguez,* 727 F. App'x 24, 28 (2d Cir. 2018) (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)).

*Hopper* – Hopper had 12 sexual encounters with Rubin; she complains of only one, the fourth. She sent hundreds of text messages and provocative photos of herself to Rubin both before and after the fourth encounter. Rubin Br. 16; A. 536, 855. Hopper points to evidence (her own testimony) that she told Rubin to stop, but that he continued to have sex with her, and that she suffered injuries. Moore & Hopper Br. 55. Hopper's testimony is, however, not credible in light of the facts that (i) the next day she sent Rubin a text that said "It was amazing and [I] love you," (ii) Hopper continued to see Rubin on eight further occasions for BDSM encounters, (iii) in all of the voluminous correspondence between Hopper and Rubin there was no mention of any incident or occasion on which Hopper felt she had been forced to engage in nonconsensual sexual acts. Rubin Br. 47; *see* A. 543, 544–45, 547–48.

Furthermore, Hopper's only testimony about her alleged withdrawal of consent during the fourth encounter is unclear. The encounter was preceded by extensive text messages in which Hopper and Rubin spoke enthusiastically and graphically about engaging in BDSM, including a text message immediately before the allegedly offensive encounter in which Hopper told Rubin that she was "ready

18

for a real beating. XOX." Rubin Br. 17; *see* A. 535, 542–44. As Hopper conceded, the purpose of her text messages and provocative photos sent to Rubin was to entice Rubin to engage in rough BDSM sex with her. *See* A. 535–36. Hopper testified about the encounter as follows:

> Q:     How long did Mr. Rubin do this to you?
>
> A:     Like an hour.
>
> Q:     What were you saying during that hour?
>
> A:     I was crying.
>
> Q:     Did you ask him to stop?
>
> A:     Yes.
>
> Q:     Did you say no?
>
> A:     Yes.
>
> Q:     Did you consent to him doing that?
>
> A:     No.
>
> Q:     After about an hour of this, what is the next thing that you remember taking place?
>
> A:     He had was finished with me. He told me to get up and take a shower.

A. 526. Nowhere in the testimony or anywhere else did Hopper testify *when* she asked Rubin to stop or *when* she said "no," and that point is critical. Hopper never testified that Rubin continued to have sex with her after she said no. The response

19

to counsel's question "[a]fter about an hour of this, what is the next thing that you remember taking place," is insufficient because it is ambiguous whether "this" refers to the sex or the expression of non-consent.  It is entirely consistent with this testimony that Rubin stopped when Hopper asked him to do so.

*Lytell* – Lytell's allegedly wrongful encounter with Rubin was the August 2016 encounter that also involved Moore.  Lytell testified that Rubin forced her to have intercourse, and her brief recounts that testimony.  Lytell Br. 13–14, 44.   The problem is the documentary evidence that Lytell does not mention:

- The next day, Lytell texted Powers that the encounter had been "unreal crazy wild fun stuff . . . Thank You for everything and for having me come have fun!!! . . . Would do that anytime again lol."  Rubin Br. 12; A. 843–44.

- Lytell also left a post-it note to Rubin telling him that "[y]ou are absolutely insane, sexy, hot, wild, & Fun!  Definitely would love to see you again soon!"  Rubin Br. 12–13; A. 853.  She was not leaving the note to obtain payment; Rubin had already paid her.  Rubin Br. 11.

- In the ensuing months, she engaged in extensive sexual banter with Rubin, sent him numerous provocative pictures and videos of herself, Moore, and others, to entice him to engage in further sexual encounters for money, A. 478–79, 480–82, 485–86, 487–89, 491, 494–502, 509–13,

met him for drinks in Miami, A. 511–12, 520, and went to his apartment
with a female friend, A. 502–06. Rubin Br. 13. She never expressed any
fear or concerns about dealing with Rubin and actively sought to engage
in further sexual relations with him. Rubin Br. 13.

Lytell argues that this Court cannot weigh the evidence because "that is the
province of the jury." Lytell Br. 44. But the Court's review of the evidence,
though deferential, is not *pro forma*, *see Price v. City of Charlotte, N.C.*, 93 F.3d
1241, 1250 (4th Cir. 1996) ("While we are compelled to accord the utmost respect
to jury verdicts and tread gingerly in reviewing them, we are not a rubber stamp
convened merely to endorse the conclusions of the jury, but rather have a duty to
reverse the jury verdicts if the evidence cannot support it.") (internal citations
omitted), and while the Court cannot make credibility determinations based on the
demeanor of witnesses—that is the jury's exclusive province—it can compare
testimony with documentary evidence, and, where the testimony is entirely at odds
with the documentary evidence, find that the testimony is simply insufficient. *See,
e.g.*, *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) (finding
appellate court may reverse a factfinder's determination where "[d]ocuments or
objective evidence [] contradict the witness' story; or the story itself [is] so
internally inconsistent or implausible on its face that a reasonable factfinder would
not credit it").

21

*Tagai and Hassen* – Although Lytell's brief is submitted only on her behalf, it contains an argument regarding the sufficiency of the evidence as to Tagai and Hassen.  Lytell Br. 45–46.  Moore and Hopper also discuss some of the evidence as to Tagai and Hassen.  Moore & Hopper Br. 24–26, 28–30.

With respect to both Tagai and Hassen, Lytell argues that their testimony, taken by itself, is sufficient to sustain the jury's finding of liability under the TVPA.  As it does with respect to Lytell herself, however (and as the Moore & Hopper Brief does with respect to Moore and Hopper), the Lytell brief ignores *all* of the voluminous documentary evidence and contradictory testimony with respect to Tagai and Hassen.  That evidence is set forth in Rubin's opening brief.  *See* Rubin Br. 13–16 (Tagai), 17–21 (Hassen), and is briefly summarized below.

Tagai's TVPA claim rested on three encounters that took place amid a five-year consensual BDSM relationship.[10]  With respect to the first encounter in October 2015, Plaintiffs' briefs ignore the contradictory documentary evidence that calls into question whether Tagai and Rubin had a sexual encounter that evening.  Rubin Br. 23, 45 (referencing Rubin's text messages noting that Tagai had fallen asleep).  Tagai's own account of the incident simply does not make sense: she

---

[10]  Moore and Hopper's characterization that "Tagai had limited understanding of BDSM" is not credible, given that Tagai testified to a number of BDSM encounters with Rubin over the course of their seven-year relationship.  *Compare* Moore & Hopper Br. 25 *with* Rubin Br. 13–14.

testified that after she was violated with the pool cue, she willingly went into the red room to engage in BDSM with Rubin.  Rubin Br. 45.  Even so, she testified that Rubin untied her after she started to squirm around.  Rubin Br. 14.  After the encounter, she sent Rubin a handwritten note and then two weeks later, she sent Rubin sensual pictures of herself.  Rubin Br. 14–15.

Plaintiffs' briefs do not contend with Tagai's May 2016 encounter, where she testified that when she started squirming around, Rubin untied her and put her on the next machine, to which she did not object.  Rubin Br. 15.  Indeed, neither of Plaintiffs' briefs even mention this encounter.  *See* Lytell Br. 9–12 (only discussing the October 2015 encounter); Moore & Hopper Br. 24–26 (only discussing the October 2015 and June 2017 encounters).

As for Tagai's June 2017 encounter, Plaintiffs similarly do not address the documentary evidence that shows that Tagai and Rubin did not have a sexual encounter that evening, although she stayed at his apartment when he went out with other friends.  Rubin Br. 23 (discussing text messages Tagai sent to Rubin).  Lytell does not mention this encounter at all.  Lytell Br. 12.  Nor do Plaintiffs contend with the multiple texts that Tagai sent to Rubin after the June 2017 encounter where she pursued additional BDSM encounters with Rubin, expressing an explicit desire to be "smacked" and "whipp[ed]."  Rubin Br. 15-16; *see* A. 732–34, 737–39.

23

With respect to Hassen, Plaintiffs' briefs also omit documentary evidence or Hassen's prior deposition testimony that contradicts Hassen's account at trial. Plaintiffs' brief does not acknowledge the emails that preceded Hassen's first encounter with Rubin where she clearly stated her willingness to engage in BDSM. Rubin Br. 17. Nor do Plaintiffs confront Hassen's inconsistent deposition testimony regarding the encounter in September 2011 and two encounters in June 2014, where she testified that she did not have sex with Rubin during the 2011 encounter and was not injured during any of these three encounters. Rubin Br. 18–20. Finally, Plaintiffs do not discuss at all the fourth encounter between Hassen and Rubin on September 25, 2014, let alone address her inconsistent deposition testimony regarding the incident. During her deposition, she did not testify that Rubin had raped her; she said only that "he put his hands on me . . . in a way that was not to my liking and it was rather aggressive." Rubin Br. 20; A. 617. After the encounter, she sent text messages to Rubin thanking him for seeing her. Rubin Br. 20, 49; A. 618.

## POINT IV

## THE TVPA DOES NOT AUTHORIZE PUNITIVE DAMAGES

In his opening brief, Rubin demonstrated that the Court should find that the TVPA does not authorize punitive damages because the statute does not expressly mention punitive damages, but says only that a plaintiff may "recover damages."

24

18 U.S.C. § 1595(a). Earlier drafts of the TVPA expressly authorized punitive damages, but that express authorization was removed from the statute as enacted. Rubin Br. 49–51.

In response, Plaintiffs join the trial court in noting that other courts of appeals have found that punitive damages are recoverable under the TVPA. Moore & Hopper Br. 59; Lytell Br. 46. But, as Rubin noted in his opening brief and Plaintiffs do not contest, several of the cases that the trial court and Plaintiffs cite were irrelevant because they were not TVPA cases at all or did not address the question of punitive damages. Rubin Br. 50–51 n.17. Plaintiffs (and the trial court) relied on the non-unanimous decision in *Ditullio v. Boehm*, 662 F.3d 1091, 1105 (9th Cir. 2011), but, as Rubin argued, that case was wrongly decided because it did not give sufficient weight to the legislative history referred to above, which was properly relied upon by the dissent. Lytell argues that punitive damages should be permitted "[b]ecause the TVPA is in part a punitive statute." Lytell Br. 47, but the only support for that proposition is that it has a "criminal aspect." *Id.* A civil action between private parties under the TVPA is principally remedial rather than punitive.

## POINT V

## RUBIN'S APPENDIX IS NOT DEFICIENT

Moore and Hopper (not Lytell) argue that Rubin's Appendix is deficient because it does not include (i) portions of the trial transcript that are favorable to Plaintiffs nor (ii) district court docket entries that are mentioned in Rubin's brief. Moore & Hopper Br. 34–36. This argument is meritless. Consistent with Federal Rule of Appellate Procedure Rule 30, Second Circuit Rule 30, and this Court's Notice of Defective Filing instructing Rubin to "file the Appendix along with the Appellant's brief," Dkt. 43.1, Rubin's Appendix consists of "the relevant docket entries in the proceeding below" and "the relevant portions of the pleadings, charge, findings, or opinion." *Gomes v. ANGOP*, 541 F. App'x 141, 141 (2d Cir. 2013). The Appendix includes the district court's entire docket report, the relevant pleadings, Rubin's Notice of Appeal, and several hundred pages of trial exhibits and trial transcript excerpts. The Special Appendix includes the decisions upon which Rubin's appeal is based. Moore and Hopper do not identify, with any degree of specificity, any portion of the trial transcript or district court docket missing from Rubin's Appendix. Moore and Hopper's blanket assertion that relevant documents are absent does not suffice to deem Rubin's Appendix deficient.

Even if the Court finds the Appendix deficient, such a finding does not warrant the dismissal of Rubin's appeal. *See M. Harvey Rephen & Assocs., P.C. v.*

26

*Chase Bank USA, N.A.*, 853 F. App'x 690, 693 (2d Cir. 2021) (declining to "impose the extreme sanction of dismissal" where appellant's filings were "seriously deficient").

## **CONCLUSION**

For the foregoing reasons and those set forth in Rubin's brief, the judgment should be reversed and vacated.  The Court should order a new trial or grant judgment as a matter of law to Defendant-Appellant Rubin on Plaintiff-Appellees' claims.

Date:  February 24, 2025
  New York, NY

          */s/ Benjamin E. Rosenberg*
          Edward A. McDonald
          Benjamin E. Rosenberg
          May K. Chiang
          DECHERT LLP
          Three Bryant Park
          1095 Avenue of the Americas
          New York, New York 10036
          Tel.: (212) 698-3500
          Fax: (212) 698-3599

          *Counsel for*
          *Defendant-Appellant*
          *Howard Rubin*

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 6,470 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: New York, New York
        February 24, 2025